COURT OF APPEALS OF VIRGINIA

Present: Judges Frank, Humphreys and Senior Judge Hodges
Argued at Chesapeake, Virginia


AMY JEAN BARRETT (CLARK), S/K/A
 AMY JEAN BARRETT, A/K/A
 AMY BARRETT CLARK
                                          OPINION BY
v.   Record No. 0581-02-1      JUDGE ROBERT J. HUMPHREYS
                                        AUGUST 26, 2003
COMMONWEALTH OF VIRGINIA


          FROM THE CIRCUIT COURT OF YORK COUNTY
                Norman Olitsky, Judge Designate

          W. Todd Watson (David B. Hargett; Hargett &
          Watson, PLC, on brief), for appellant.

          Eugene Murphy, Assistant Attorney General
          (Jerry W. Kilgore, Attorney General, on
          brief), for appellee.


     Amy Jean Barrett appeals her conviction, following a jury

trial, for two counts of felony child abuse, in violation of

Code § 18.2-371.1(A) and 18.2-371.1(B).[1]  Barrett contends the

trial court erred in refusing to quash the indictment stating

the charge under Code § 18.2-371.1(B).  Barrett further contends

the trial court erred in finding the evidence sufficient, as a

matter of law, to support her convictions and that the court

failed to properly instruct the jury with regard to the duty of

---

      [1] Barrett was also tried on a charge of involuntary
manslaughter, in violation of Code § 18.2-33.  The jury
acquitted Barrett of that charge.

ordinary care.  Finding no error, we affirm the judgment of the trial court.

## I.  Background

In accordance with settled principles of appellate review, we state the evidence presented at trial in the light most favorable to the Commonwealth, the prevailing party below. Burns v. Commonwealth, 261 Va. 307, 313, 541 S.E.2d 872, 877 (2001).

In April of 1998, Barrett lived in the Wythe Creek Apartments with her boyfriend, Craig Griffith, and her two children.  Barrett's oldest child, P.B., was two years and ten months of age at that time.  Her youngest child, J.B., was ten months of age at the time.

On the evening of Friday, April 17, 1998, Barrett, Griffith and the children watched television until she put the children to bed.  Barrett then left the apartment and "went out." Barrett had not returned home when Griffith went to bed that evening.

Griffith woke up the next morning at approximately 5:00 a.m.  Barrett had not yet returned home.  Griffith took a shower and got ready for work that day.  Because of some problems with the plumbing, approximately two inches of water remained in the bathtub after Griffith finished his shower and turned off the water.

Barrett arrived home at approximately 5:30 to 6:00 a.m. that morning. Griffith "wasn't happy" with her and immediately left for work.

Griffith returned to the apartment at approximately noon. The weather that morning was "cold, nasty," so he returned to get his coat before going to the Langley Auction. When Griffith arrived, the apartment door was locked. After he unlocked the door and stepped inside, he found the apartment to be a "wreck." P.B. was "standing there with make-up on and no clothes. [Barrett] was asleep on the couch. The house was just tore up." The television was on, but "playing static."

Griffith asked P.B. where J.B. was. P.B. replied, "He's in there," and pointed toward the hallway of the apartment. Griffith looked in both bedrooms but could not find J.B. Griffith then asked P.B., "Where in there?" P.B. said, "In there." Griffith then realized that P.B. was telling him J.B. was in the bathroom. Griffith pushed open the door to the bathroom and saw a blanket lying over the bathtub. When he removed the blanket, Griffith saw "a lot of junk, toys, food, a laundry basket upside down," in the tub. He removed the laundry basket and found J.B. lying underneath it. Cold water was running from the tub waterspout. Griffith turned off the hot water faucet, but was unable to turn off the cold faucet. The cold faucet "just kept spinning around." Griffith saw that J.B. was blue and that his mouth was stuffed with potato chips. He

picked him up and "screamed" for Barrett, stating "she had killed her kid." Barrett awoke and called 911. J.B. was pronounced dead at 12:24 p.m. that day at Riverside Hospital in Newport News.

Barrett was subsequently indicted for felony child neglect of J.B., in violation of Code § 18.2-371.1(A) (a Class 4 felony) and felony murder. Following a jury trial on February 2 and 3, 1999, Barrett was convicted of those charges. However, on June 27, 2000, a panel of this Court reversed and remanded both convictions, finding that although the evidence was sufficient to establish the requisite intent necessary for felony child neglect, the jury should have been instructed as to the meaning of the term "willful" and that the evidence was insufficient to support Barrett's conviction for felony murder. See Barrett v. Commonwealth, 32 Va. App. 693, 530 S.E.2d 437 (2000).

On April 3, 2001, the Commonwealth and counsel for Barrett executed an order amending the original indictment for felony murder of J.B., to one of involuntary manslaughter. During plea negotiations, the Commonwealth made it clear to Barrett that it intended to proceed with a new trial on that charge, as well as the charge of felony child neglect under Code § 18.2-371.1(A). The Commonwealth further expressed to Barrett that if she refused to plead guilty to those two charges, the Commonwealth intended to seek an additional indictment for felony child neglect of P.B., under Code § 18.2-371.1(B) (a Class 6 felony).

- 4 -

On May 22, 2001, after plea negotiations had failed, the Commonwealth sought and received the additional indictment charging Barrett with felony child neglect under Code § 18.2-371.1(B).

Barrett filed a motion to quash the new indictment on May 24, 2001. During the hearing on the motion, on June 5 and 6, 2001, Barrett contended that the new indictment, for felony neglect, should be quashed because the Commonwealth pursued the new charge as "punishment to [Barrett] for having . . . successfully appealed her initial charges." Barrett argued that because the new charge was based upon the same factual circumstances she was tried for during the first trial, but was not pursued during the first trial, the timing and basis of the new charge served to raise a presumption of prosecutorial vindictiveness, resulting in a violation of Barrett's Fifth Amendment right of due process.

Initially, an Assistant Commonwealth's Attorney responded that the additional charge of neglect was not pursued during the first trial because they "failed to . . . consider [it]." The Assistant explained that after reading the opinion from this Court, reversing Barrett's initial convictions, they realized they should have focused on the fact that P.B. was not an "intervening cause" or the "villain in this case," but was also a victim. Thus, the thought "came into [their] minds," in April

of 2001, that they should pursue the additional charge for felony neglect of P.B.

The Commonwealth's Attorney for York County next addressed the trial court and stated that she had been involved in the first trial, as well as the "original preliminary hearing," but the Assistant had not been involved in that preliminary hearing. The Commonwealth's Attorney then informed the trial court that they had indeed considered bringing the additional charge prior to the first trial, but "[i]t was simply not done initially because . . . the focus was on the felony murder charge. And then when it was thought of, it was a very short time, two or three weeks prior to the initial trial." The Commonwealth's Attorney contended that because it was "too late" to pursue the charge at that time, it chose to proceed only on the indictments for felony murder and felony child neglect pertaining to J.B. "And then, of course, clearly, once the Court of Appeals' analysis came back, it became abundantly clear that the lack of that charge, perhaps allowed for an analysis that we didn't feel was appropriate."

After taking the matter under advisement, the trial court denied the motion finding "no presumption of vindictiveness," nor evidence of "actual vindictiveness."[2]

During Barrett's new trial, held on November 14, 15 and 16, 2001, Marilyn Jenkins testified that she was a volunteer with the Poquoson Fire and Rescue Squad on April 18, 1998 and had responded to the scene. Jenkins testified that when she arrived, she found P.B. in the living room. She observed that P.B. was dry, but completely naked, and appeared to have mascara running down her face. She observed that J.B. was "gray" and "already appeared to be dead." She testified that his diaper was soaked with water and urine. When she went into the bathroom, Jenkins observed that it was "a complete mess. The tub was full of just about everything you could think of, . . . . There was blankets, laundry basket, food. The tub was absolutely full of toys." Jenkins stated that there was no water in the bathtub at that time.

Elizabeth Kinnison, the forensic pathologist who participated in J.B.'s autopsy, testified that J.B.'s cause of death was drowning. She further stated that during the autopsy, she observed 13 bruises present on the baby's forehead and "top

---

[2] The trial court's finding was apparently relayed to the parties during a telephone conference. We find no transcript of the telephone conference in the appendix or record on appeal. Instead, we rely solely on the trial court's restatement of its ruling during the initial retrial, held on August 21, 2001 (the initial retrial ended in a mistrial).

sides of his head." She stated that the bruises appeared to be "fresh bruises with no significant evidence of healing."

Jane Steele, an emergency room nurse who accompanied the doctor to inform Barrett that the baby had died, testified that Barrett was "upset and crying, blamed a sibling, another child." Barrett then "turned and just blamed herself." Sergeant William Fordham, of the Poquoson Police Department, testified that he arrived at the hospital just after J.B. was pronounced dead. Fordham asked Barrett for a statement. He testified as follows regarding her statement.

> [Barrett] advised me that she was taking a nap on the couch and that she had placed [J.B.] on the floor next to the couch. He was drinking a bottle. At the hospital she said it was about 11:00 to 11:30 in the morning and [P.B.] was in her room asleep when she began the nap with [J.B.]. She advised me during the course of that interview that there was something wrong with her daughter [P.B.], that she constantly abuses her brother [J.B.]. She made an example of her tying scarves around his neck and pulling him around the apartment, slamming her bedroom door into his face when he attempted to crawl into the room. She went on to advise me that four to five days prior to this incident that [P.B.] had pulled [J.B.] into the bathtub with her and that it was just lucky that she was there to save him on that occasion. She told me several times that [P.B.] intentionally killed [J.B.] and that she had tried in the past but today she had been successful.

- 8 -

> I questioned her about the circumstances
> that morning. She advised me that nap time
> was around the same time every day depending
> on when the children wake up in the morning
> and [that day] was nothing unusual. She was
> very angry and she didn't want to even look
> at or be in the same room with [P.B.].

Sergeant Fordham testified that he also observed an interview between Barrett and two employees of social services that took place that same day. He testified that his notes reflected several of Barrett's statements.

> She said, quote, ["]My baby is f------ dead
> and that's all I know.["] She repeated
> earlier statements. She said, quote, ["]I
> don't want [P.B.].["] She repeated this
> three times. ["][P.B.] intentionally killed
> my son. All I know is my son is f------
> dead and she killed him. I don't want
> her.["] She was upset. She said at this
> point, ["]I can't even look at her I'm so
> angry.["] She began to cry. She said,
> ["]It's my fault. I shouldn't have taken a
> nap.["]

(Alterations added).

Fordham stated that he later returned to Barrett's apartment to conduct further investigation. He measured the apartment and found it to be approximately 850 square feet.

Griffith testified that the plumbing in the apartment was old. He stated that, approximately three months prior to the incident, he and Barrett had moved J.B's crib into their room because P.B. had crawled into the crib and "was putting toys and stuff on top" of J.B. Griffith testified that P.B. was "jealous" of J.B. and that he had observed her cover J.B. with a

blanket on one occasion, and push him down on "two or three" occasions. He further stated that Barrett was present during these incidents and that he had warned her to closely supervise the children. He testified that when he left for work on the morning of J.B.'s death, J.B. was asleep in his crib and Barrett was taking P.B., who was awake at the time, "back" into P.B.'s bedroom.

The Commonwealth also introduced a videotape of an April 22, 1998 interview between Barrett and an employee of social services. The tape was viewed by the jury. During the taped interview, Barrett stated that P.B. was jealous of J.B. from the "beginning." She acknowledged that P.B. had thrown toys into J.B's crib and on one occasion, had hit him in the head with a broom. Barrett stated that the bathtub was P.B.'s favorite place to play and that she allowed her to sit in the tub with her toys for up to 45 minutes at a time. She told the social worker that P.B. could turn on the hot water faucet on her own, and that she could lift J.B. She also stated that P.B. had pulled J.B. into the bathtub a few days before the incident and that J.B. was submerged completely under the water. She stated this "terrified" her.

Barrett further acknowledged that she had gone out the night before the incident and had consumed three to five beers. She stated that she was not "completely intoxicated." However, she conceded that she would have been arrested for driving under

the influence had she been stopped by police on her way home. She stated she was "extremely tired" when she arrived home that morning, and acknowledged that she "most definitely" had alcohol remaining in her system that morning. Barrett added that she took some non-drowsy sinus medication that morning and that it was not "anywhere near nap time" for the children when she sent P.B. to her room. Barrett agreed that she failed to supervise the children that morning, and stated that she was sleeping "pretty hard."

Following the Commonwealth's case-in-chief, Barrett moved to strike the evidence arguing, in relevant part, that the Commonwealth failed to produce evidence sufficient to prove "foreseeability" and "callous disregard for human life and a probable consequence of the act."[3] The trial court denied the motion. At that time, Barrett rested and "renew[ed] all of [her] motions, the ones [counsel] argued before the last mistrial as well as the motions [counsel] argued just a few moments ago." Finding the issue to be a question of fact for the jury (on the motion to strike), the trial court denied the motion.

Both parties then tendered their proposed jury instructions to the trial court. Based upon the Supreme Court of Virginia's

---

[3] In his argument, counsel for Barrett did not distinguish between the neglect charges and the manslaughter charge, but apparently intended his arguments to apply to each charge.

decision in Chapman v. City of Virginia Beach, 252 Va. 186, 475 S.E.2d 798 (1996), a civil case, Barrett proposed an instruction stating "A parent has a legal duty to exercise ordinary care for the child's safety, but this duty does not impose an absolute requirement that a parent oversee and guide a child's activities every moment." The Commonwealth objected to the instruction and proposed its own instruction that omitted the portion of the instruction referring to the "absolute requirement."

During argument on the issue, Barrett contended the instruction implicated the degree of negligence necessary to be proven. The Commonwealth replied, "Judge I think the ordinary care comes in the manslaughter instruction." In discussing the manslaughter instruction, which stated "the defendant owed [J.B.] a legal duty," the Commonwealth stated, "I think that's where it arises." Counsel for Barrett agreed, stating "Judge, the question that could easily come from the jury is what's the legal duty in this situation? I think that's why we provided the care instruction." Counsel for Barrett further stated "Our position would be that the instruction that defines the duty goes directly to the duty in Instruction 10."[4] Finally, counsel for Barrett argued, "Judge, I think the issue that we tried to address earlier was it doesn't necessarily go to the neglect

_____

[4] Instruction 10 was not produced in the appendix on appeal. However, our review of the record reveals that particular instruction instructed the jury on the elements of involuntary manslaughter.

- 12 -

charges as much as it goes to the manslaughter. The manslaughter says legal duty. That's one of the elements the Commonwealth has to prove. We're asking that that duty be defined." The trial court then denied the instruction as proposed by Barrett, and "put in the Commonwealth's" instruction.

During closing argument, Barrett argued that the Commonwealth failed to produce sufficient evidence to demonstrate the requisite foreseeability or willfulness with regard to both charges of neglect. The jury ultimately found Barrett not guilty on the involuntary manslaughter charge, but found her guilty of each count of felony child neglect. On January 24, 2002, Barrett was sentenced to two years in prison on the Class 4 felony. Barrett was also ordered to pay a fine of $1,000 for the Class 4 felony, and a fine of $2,500 on the Class 6 felony.

## II. Analysis

On appeal, Barrett argues the trial court erred in refusing to quash the indictment alleging felony neglect of P.B. Barrett further contends the trial court erred in finding the evidence sufficient, as a matter of law, to support her convictions and that the court failed to properly instruct the jury with regard to the duty of ordinary care. For the following reasons, we disagree.

A.

Barrett first claims the trial court should have quashed the new indictment, pertaining to the felony neglect of P.B., in violation of Code § 18.2-371.1(B). Barrett argues that the new indictment violated her right to due process because it was "based on the same facts, transaction or occurrence, and [Barrett] is being punished for exercising her right to appeal the first set of convictions." Thus, Barrett claims the indictment "should have been quashed based on prosecutorial vindictiveness or the appearance of vindictiveness."[5]

The specific question of whether a prosecutor's action in seeking a new, additional indictment after a defendant has prevailed in an appellate court, is one of first impression in Virginia. We note at the outset that "[i]t is well established that the choice of offenses for which a criminal defendant will be charged is within the discretion of the Commonwealth's Attorney." Kauffmann v. Commonwealth, 8 Va. App. 400, 410, 382 S.E.2d 279, 284 (1989). Indeed, "the institution of criminal charges, as well as their order and timing, are matters of prosecutorial discretion." Bradshaw v. Commonwealth, 228 Va. 484, 492, 323 S.E.2d 567, 572 (1984). Nevertheless, prosecutorial discretion "is not '"unfettered." Selectivity in

_____

[5] Barrett makes no double jeopardy claim on appeal but relies solely on her claim of prosecutorial vindictiveness in the context of the additional indictment.

- 14 -

the enforcement of criminal laws is . . . subject to constitutional constraints.'" Wayte v. United States, 470 U.S. 598, 608 (1985) (quoting United States v. Batchelder, 442 U.S. 114, 125 (1979) (footnote omitted)). "In particular, the decision to prosecute may not be '"deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification,"' Bordenkircher v. Hayes, [434 U.S. 357,] 364 [(1978)], quoting Oyler v. Boles, 368 U.S. 448, 456 (1962), including the exercise of protected statutory and constitutional rights, see United States v. Goodwin, [457 U.S. 368,] 372 [(1982)]." Wayte, 470 U.S. at 608. Thus, "if a prosecutor responds to a defendant's successful exercise of his right to appeal by bringing a more serious charge against him, he acts unconstitutionally." United States v. Wilson, 262 F.3d 305, 314 (4th Cir. 2001) (citing Blackledge v. Perry, 417 U.S. 21, 28-29 (1974)). Such retaliatory conduct amounts to vindictive prosecution and "violates a defendant's Fifth Amendment right to due process." United States v. Lanoue, 137 F.3d 656, 664-65 (1st Cir. 1998) (citing Goodwin, 457 U.S. at 372).

We review a trial court's factual findings on prosecutorial vindictiveness for plain error, but we review its legal analysis de novo. See Timbers v. Commonwealth, 28 Va. App. 187, 193, 503 S.E.2d 233, 193 (1998); Quinn v. Commonwealth, 25 Va. App. 702,

712, 492 S.E.2d 470, 475-76 (1997); see also United States v. Johnson, 91 F.3d 695, 698 (5th Cir. 1996).

In North Carolina v. Pearce, 395 U.S. 711 (1969), the United States Supreme Court recognized an "institutional bias inherent in the judicial system against the retrial of issues that have already been decided." Goodwin, 457 U.S. at 376. In Pearce, two criminal defendants successfully appealed their convictions, causing a complete retrial. After retrial, the defendants were again convicted, but were given more severe sentences than they had received following their first trials. The Court noted:

> It can hardly be doubted that it would be a flagrant violation of the Fourteenth Amendment for a state trial court to follow an announced practice of imposing a heavier sentence upon every reconvicted defendant for the explicit purpose of punishing the defendant for his having succeeded in getting his original conviction set aside. Where, as in each of the cases before us, the original conviction has been set aside because of a constitutional error, the imposition of such a punishment, "penalizing those who choose to exercise" constitutional rights, "would be patently unconstitutional." United States v. Jackson, 390 U.S. 570, 581 [(1968)]. And the very threat inherent in the existence of such a punitive policy would, with respect to those still in prison, serve to "chill the exercise of basic constitutional rights." Id., at 582. See also Griffin v. California, 380 U.S. 609 [(1965)]; cf. Johnson v. Avery, 393 U.S. 483 [(1969)]. But even if the first conviction has been set aside for non-constitutional error, the imposition of a penalty upon the defendant for having successfully pursued a statutory

- 16 -

> right of appeal or collateral remedy would be no less a violation of due process of law. "A new sentence, with enhanced punishment, based upon such a reason, would be a flagrant violation of the rights of the defendant." Nichols v. United States, 106 F. 672, 679 [(1901)]. A court is "without right to . . . put a price on an appeal. A defendant's exercise of a right of appeal must be free and unfettered. . . . [I]t is unfair to use the great power given to the court to determine sentence to place a defendant in the dilemma of making an unfree choice." Worcester v. Commissioner, 370 F.2d 713, 718 [(1966)]. See Short v. United States, 120 U.S. App. D.C. 165, 167, 344 F.2d 550, 552 [(1965)].

Pearce, 395 U.S. at 723–24 (footnote omitted). Thus, the Court held that:

> In order to assure the absence of such a [vindictive] motivation, we have concluded that whenever a judge imposes a more severe sentence upon a defendant after a new trial, the reasons for his doing so must affirmatively appear. Those reasons must be based upon objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding. And the factual data upon which the increased sentence is based must be made part of the record, so that the constitutional legitimacy of the increased sentence may be fully reviewed on appeal.

Id. at 726.

The United States Supreme Court later extended this rationale to the actions of a prosecutor in Blackledge. In that case, a criminal defendant was convicted of misdemeanor assault in district court. 417 U.S. at 22. The defendant then exercised his statutory right of appeal to the superior court

- 17 -

seeking a trial de novo.  Id.  After the defendant filed his notice of appeal, the prosecutor obtained an indictment against the defendant for felony assault, based upon the same conduct for which the defendant had been tried and convicted in district court.  Id. at 23.  The defendant was convicted of the felony charge and given a greater sentence than he had received in district court.  Id.

In Blackledge, the Supreme Court stated the lesson emerging from Pearce was "that the Due Process Clause is not offended by all possibilities of increased punishment upon retrial after appeal, but only by those that pose a realistic likelihood of 'vindictiveness.'"  Id. at 27.

> A prosecutor clearly has a considerable stake in discouraging convicted misdemeanants from appealing and thus obtaining a trial de novo in the Superior Court, since such an appeal will clearly require increased expenditures of prosecutorial resources before the defendant's conviction becomes final, and may even result in a formerly convicted defendant's going free.  And, if the prosecutor has the means readily at hand to discourage such appeals - by "upping the ante" through a felony indictment whenever a convicted misdemeanant pursues his statutory appellate remedy - the State can insure that only the most hardy defendants will brave the hazards of a de novo trial.
>
> There is, of course, no evidence that the prosecutor in this case acted in bad faith or maliciously in seeking a felony indictment against [the defendant].  The rationale of our judgment in the Pearce case, however, was not grounded upon the proposition that actual retaliatory

motivation must inevitably exist. Rather, we emphasized that "since the fear of such vindictiveness may unconstitutionally deter a defendant's exercise of the right to appeal or collaterally attack his first conviction, due process also requires that a defendant be freed of apprehension of such a retaliatory motivation on the part of the sentencing judge." 395 U.S., at 725. We think it clear that the same considerations apply here.

. . . We hold, therefore, that it was not constitutionally permissible for the State to respond to [the defendant's] invocation of his statutory right to appeal by bringing a more serious charge against him prior to the trial de novo.

Blackledge, 417 U.S. at 27-28. In a footnote, however, the Court added:

This would clearly be a different case if the State had shown that it was impossible to proceed on the more serious charge at the outset, as in Diaz v. United States, 223 U.S. 442 [(1912)]. In that case the defendant was originally tried and convicted for assault and battery. Subsequent to the original trial, the assault victim died, and the defendant was then tried and convicted for homicide. Obviously, it would not have been possible for the authorities in Diaz to have originally proceeded against the defendant on the more serious charge, since the crime of homicide was not complete until after the victim's death.

Id. at 29 n.7.

Subsequently, in Goodwin, the United States Supreme Court restated the rule announced in Bordenkircher. Goodwin, 457 U.S. at 377-78. In Bordenkircher, the Court held that "no presumption of vindictiveness arose where the prosecution sought and obtained greater charges after plea negotiations failed and after the

- 19 -

defendant moved for a jury trial. '[T]he timing of the prosecutor's action in [such a] case,' . . . 'suggests that a presumption of vindictiveness is not warranted.'" Battle v. Commonwealth, 12 Va. App. 624, 629, 406 S.E.2d 195, 197 (1991) (quoting Goodwin, 457 U.S. at 381); see also Bordenkircher, 434 U.S. at 358-59, 364. The Court in Goodwin expounded upon that reasoning, noting that

> [t]here is good reason to be cautious before adopting an inflexible presumption of prosecutorial vindictiveness in a pretrial setting. In the course of preparing a case for trial, the prosecutor may uncover additional information that suggests a basis for further prosecution or he simply may come to realize that information possessed by the State has a broader significance. At this stage of the proceedings, the prosecutor's assessment of the proper extent of prosecution may not have crystallized. In contrast, once a trial begins - and certainly by the time a conviction has been obtained - it is much more likely that the State has discovered and assessed all of the information against an accused and has made a determination, on the basis of that information, of the extent to which he should be prosecuted. Thus, a change in the charging decision made after an initial trial is completed is much more likely to be improperly motivated than is a pretrial decision.

Goodwin, 457 U.S. at 381.

Based upon the above discussion, it is clear that Pearce and its progeny stand for the proposition that we must

> reverse a conviction that is the result of a vindictive prosecution where the facts show an actual vindictiveness or a sufficient likelihood of vindictiveness to warrant such a presumption. See [Goodwin, 457 U.S. at 373;] U.S. v. Marrapese, 826 F.2d 145, 147

> (1st Cir. 1987). If the defendant creates a
> presumption of vindictiveness the burden
> shifts to the government to show that
> legitimate reasons exist for the
> prosecution. [Goodwin, 457 U.S.] at 376
> n.8.

Lanoue, 137 F.3d at 664.

A finding of actual vindictiveness occurs "only in a rare case" as it would require a defendant to produce direct evidence, such as evidence of a vindictive statement made by a prosecutor. See Goodwin, 457 U.S. at 380-81; see also United States v. Johnson, 171 F.3d 139, 140-41 (2d Cir. 1999). Barrett has pointed to no such evidence in the record demonstrating actual vindictiveness on the part of the Commonwealth's attorneys involved in her case. Instead, Barrett argues that the vindictiveness should be presumed based upon their conduct and "contradictory" explanations supporting the new, additional indictment for felony child neglect.

However, the United States Supreme Court has explicitly limited the application of the Pearce presumption, "like that of 'other "judicially created means of effectuating the rights secured by the [Constitution],"' to circumstances 'where its "objectives are thought most efficaciously served,"' Texas v. McCullough, [475 U.S. 134, 138 (1986)], quoting Stone v. Powell, 428 U.S. 465, 482, 487 (1976)." Alabama v. Smith, 490 U.S. 794, 799-800 (1989). "Such circumstances are those in which there is a 'reasonable likelihood,'" that the conduct at issue "is the product of actual vindictiveness on the part" of the acting authority. Id. (quoting Goodwin, 457 U.S. at 373). Indeed, "such a presumption is warranted only when circumstances warrant

it for all cases of the type presented." Wilson, 262 F.3d at 315. Further, "[b]ecause of [the] necessary presumption of prosecutorial regularity, a presumption of vindictive prosecution or any other type of selective prosecution, must be supported by a showing sufficiently strong to overcome the presumption of prosecutorial regularity." Id.

> This court examines the prosecutor's conduct in light of the entire proceedings to determine whether it gives rise to a presumption of vindictiveness. In determining if a presumption of vindictiveness is warranted, "the appropriate inquiry is whether . . . for example, where, after the defendant's prior exercise of a procedural or substantive legal right, or his having succeeded in reversing a conviction on appeal, the prosecution acts arguably to punish the exercise of such rights, by increasing the measure of jeopardy by bringing additional or more severe charges[.]" United States v. Ward, 757 F.2d 616, 619-20 (5th Cir. 1985).

Johnson, 91 F.3d at 698 (alteration in original).

We need not decide whether the additional charge at issue here increased the "measure of jeopardy" for Barrett, nor do we find it necessary to determine whether the Pearce presumption must apply on these facts – namely, a re-trial post-appeal where the defendant is subjected to a new, additional charge. Indeed, assuming, without deciding, that the presumption applies, the record here clearly demonstrates the trial court found no actual vindictiveness and that it determined the Commonwealth's attorneys presented sufficient objective evidence supporting the legitimacy of their conduct, overcoming any presumption of

- 22 -

vindictive prosecution.  We find no error in that determination.[6]

Specifically, the Commonwealth's Attorney and her Assistant stated that they failed to proceed with the additional felony neglect charge in the first proceeding because they did not "focus" on bringing the charge until the eve of the initial trial.  At that time, they determined that the cost of delaying the trial to seek the additional indictment was outweighed by the benefit of proceeding directly to trial on the felony murder charge and the single count of neglect.  The attorneys further explained that they sought the additional charge for the second prosecution based upon their interpretation of the opinion from this Court, reversing Barrett's initial convictions.  Moreover, although probative, the timing of the additional indictment does not squarely comport with Barrett's claim of vindictive prosecution.  The opinion issued by this Court, reversing Barrett's initial convictions, was released on June 27, 2000. The Commonwealth prepared for the new trial, entered into plea negotiations with Barrett, and did not seek the new, additional indictment until after those negotiations had failed, in May of 2001 – nearly 11 months after Barrett's successful appeal.[7]

Accordingly, we do not find that the trial court erred in

---

[6]  We note that Barrett's counsel conceded during oral argument that the trial court accepted the Commonwealth attorney's explanation.  Barrett further conceded that the issue on appeal is thus, merely a question of law.

- 23 -

refusing to quash the indictment on the basis of vindictive prosecution. The record clearly reflects that the Commonwealth presented objective evidence, satisfactory to the trial court, of legitimate reasons for its actions, overcoming any presumption and/or "reasonable likelihood" of vindictiveness. See Smith, 490 U.S. at 800.

B.

Barrett next argues the evidence was insufficient to support her convictions for felony child neglect, in violation of Code § 18.2-371.1(A) and (B). We find no merit in these contentions.

Code § 18.2-371.1 provides as follows, in relevant part:

> A. Any parent, guardian, or other person responsible for the care of a child under the age of eighteen who by willful act or omission or refusal to provide any necessary care for the child's health causes or permits serious injury to the life or health of such child shall be guilty of a Class 4 felony. For purposes of this subsection, "serious injury" shall include but not be limited to (i) disfigurement, (ii) a fracture, (iii) a severe burn or laceration, (iv) mutilation, (v) maiming, (vi) forced ingestion of dangerous substances, or (vii) life-threatening internal injuries.
>
> B. Any parent, guardian, or other person responsible for the care of a child under the age of eighteen whose willful act or

---

[7] We note further that the trial court implicitly rejected Barrett's assertion that the Commonwealth's explanations were contradictory. We find no error in such a determination. In fact, the Commonwealth's Attorney's explanation, although more detailed, was consistent with the Assistant Commonwealth's Attorney's assertions. Moreover, as the Commonwealth's Attorney stated, she was involved in the preliminary hearing prior to the first trial, whereas the Assistant was not.

> omission in the care of such child was so
> gross, wanton and culpable as to show a
> reckless disregard for human life shall be
> guilty of a Class 6 felony.

Barrett first claims that the trial court erred in finding the evidence sufficient to prove that her conduct, with regard to P.B., was so gross, wanton and culpable as to show a reckless disregard for human life, as required by Code § 18.2-371.1(B). However, in describing the meaning of this phrase in terms of the involuntary manslaughter statute, the Supreme Court of Virginia has held that:

> the term "gross, wanton, and culpable"
> describes conduct.  The word "gross" means
> "aggravated or increased negligence" while
> the word "culpable" means "deserving of
> blame or censure."  [Bell v. Commonwealth,
> 170 Va. 597, 611, 195 S.E. 675, 681 (1938)].
> "'Gross negligence' is culpable or criminal
> when accompanied by acts of commission or
> omission of a wanton or wilful nature,
> showing a reckless or indifferent disregard
> of the rights of others, under circumstances
> reasonably calculated to produce injury, or
> which make it not improbable that injury
> will be occasioned, and the offender knows,
> or is charged with the knowledge of, the
> probable result of his acts."  Id. at
> 611-12, 195 S.E. at 681.

Cable v. Commonwealth, 243 Va. 236, 240, 415 S.E.2d 218, 220 (1992).  We have defined the term "wilful" as

> an act done with a bad purpose, without
> justifiable excuse, or without ground for
> believing it is lawful.  The term denotes
> "'an act which is intentional, or knowing,
> or voluntary, as distinguished from
> accidental.'"  The terms "bad purpose" or
> "without justifiable excuse," while facially
> unspecific, necessarily imply knowledge that
> particular conduct will likely result in
> injury or illegality.

- 25 -

<u>Ellis v. Commonwealth</u>, 29 Va. App. 548, 554, 513 S.E.2d 453, 456 (1999) (citations omitted).

Viewed in the light most favorable to the Commonwealth, we find the evidence here sufficient to support Barrett's conviction under Code § 18.2-371.1(B). Indeed, although "something more than negligence must be proved," <u>id.</u> at 555, 513 S.E.2d at 457, the evidence here plainly demonstrated that Barrett was aware of the potential and likely dangers resulting from her conduct. Namely, intentionally creating a situation where the two-year-old child, with known aggressive tendencies toward her sibling, was left completely unsupervised.

Barrett conceded that she knew P.B. enjoyed playing in the bathtub, that she could turn on the "hot" water faucet to the tub on her own, and that she possessed sufficient strength to pull her ten-month-old sibling into the bathtub. Logic would therefore dictate that P.B. possessed sufficient strength and ability to climb into the bathtub herself, or to at least place herself in a life-threatening situation, not understanding the potential danger.

Nevertheless, Barrett intentionally spent the evening away from home on the Friday prior to the incident. During her night out, Barrett admittedly drank enough alcohol to render herself legally intoxicated the following morning when she drove herself home. Knowing that she was very tired, and intoxicated, Barrett then took sinus medication. Furthermore, Barrett conceded that she "should not have taken a nap" and that she sent P.B. to her bedroom for her own nap well before P.B.'s usual nap time. From this evidence, the jury could have reasonably concluded that

Barrett intended to fall asleep on the couch and/or that she was aware, due to her condition at the time, that she would fall asleep. Barrett engaged in this course of conduct knowing that she was solely responsible for the care of P.B. and her infant brother that Saturday morning.

Given the combination of these circumstances, we find the evidence amply supported the determination that Barrett willfully, wantonly, and culpably created a situation in her home that exposed P.B. to injury and/or risk of death. By doing so, Barrett demonstrated a reckless and wanton disregard for P.B.'s life and health. Proof of such conduct supports Barrett's conviction.[8] Thus, we find no error on the part of the trial court in refusing to sustain Barrett's motion to strike.

Barrett next claims that the trial court erred in finding the evidence sufficient to prove that she knew, or reasonably should have foreseen the death of J.B., as required by Code § 18.2-371.1(A).

As stated above, Code § 18.2-371.1(A) requires that the conduct "caus[ing] or permit[ing]" serious injury to the life or health of the child at issue be wilful in nature. See Ellis, 29

---

[8] Barrett's contention that because the jury acquitted her of involuntary manslaughter, the jury's findings of neglect were inconsistent, is also without merit. As the Supreme Court has often held, inconsistent jury verdicts are not invalid per se. See Sullivan v. Commonwealth, 214 Va. 679, 204 S.E.2d 264 (1974). Furthermore, to find the evidence sufficient to support a charge of involuntary manslaughter, the jury must not only find that the defendant's conduct was so gross, wanton, and culpable as to show a reckless disregard of human life, but must also find that the conduct was the proximate cause of the death. Cable, 243 Va. at 240, 415 S.E.2d at 220. Thus, to presume these verdicts were inconsistent would require an exercise in pure speculation – an exercise in which we decline to engage.

Va. App. at 554, 513 S.E.2d at 456.  In Ellis, we specifically recognized that the terms "bad purpose" or "without justifiable excuse," used to describe the term "wilful," "while facially unspecific, necessarily imply knowledge that particular conduct will likely result in injury or illegality."  Id.

Unlike the facts in Ellis, the circumstances here clearly support the conclusion that Barrett knew death, or serious injury to J.B., was a likely result of her actions.  Indeed, the

evidence demonstrated that Barrett knew P.B. was aggressive toward J.B., that she could carry J.B. or coax him into various rooms of the apartment, and that P.B. had pulled J.B. into the bathtub on a prior occasion, completely submerging him under the water.

Thus, Barrett's condition, intentionally and knowingly created by her, causing her to succumb to "hard" sleep, in conjunction with her knowledge that there were no other adults in the home supervising the children, provided the jury with ample reason to find that her conduct amounted to more than mere inadvertence or negligence. Indeed, her conduct warranted a finding that she acted in a "conscious disregard" of the likely present danger to the life or health of her children, particularly the ten-month-old infant, J.B. See id. at 555, 513 S.E.2d at 457. Once again, such evidence supports her conviction and we find no error in the trial court's judgment on her motion to strike.

C.

Barrett finally argues that the trial court failed to properly instruct the jury with regard to the duty of ordinary care. However, at trial, Barrett argued that her proposed ordinary care instruction should be given to properly explain the Commonwealth's instruction pertaining to the involuntary manslaughter charge. Barrett's counsel did not argue that the instruction related to the neglect instructions, stating "it doesn't necessarily go to the neglect charges as much as the manslaughter. The manslaughter [instruction] says legal duty. That's one of the elements the Commonwealth has to prove. We're

asking that that duty be defined."  As noted above, the jury acquitted Barrett of involuntary manslaughter.

Accordingly, because Barrett failed to put this argument before the trial court in relation to the instructions pertaining to felony child neglect, we do not consider it for the first time on appeal.  See Rule 5A:18; see also West Alex. Prop. v. First Va. Mort., 221 Va. 134, 138, 267 S.E.2d 149, 151 (1980) ("On appeal, though taking the same general position as in the trial court, an appellant may not rely on reasons which could have been but were not raised for the benefit of the lower court."); Floyd v. Commonwealth, 219 Va. 575, 584, 249 S.E.2d 171, 176 (1978) (holding that appellate court will not consider an argument on appeal that is different from the specific argument presented to the trial court, even if it relates to the same general issue).

For the reasons stated above, we affirm the judgment of the trial court.

Affirmed.