COURT OF APPEALS OF VIRGINIA


Present:   Judges Annunziata, Humphreys and McClanahan
Argued at Richmond, Virginia


REIDA K. MORTON

                                                    MEMORANDUM OPINION[*] BY
v.        Record No. 2677-02-2           JUDGE ROBERT J. HUMPHREYS
                                                         JANUARY 28, 2004
COMMONWEALTH OF VIRGINIA


              FROM THE CIRCUIT COURT OF HENRICO COUNTY
                             George F. Tidey, Judge

          Sherry Netherland (Michael Morchower; Morchower, Luxton &
          Whaley, on brief), for appellant.

          Virginia B. Theisen, Assistant Attorney General (Jerry W. Kilgore,
          Attorney General, on brief), for appellee.


        Reida K. Morton appeals her convictions, after a jury trial, for felony child neglect (in

violation of Code § 18.2-371.1) and misdemeanor assault and battery (in violation of Code

§ 18.2-57).  Morton contends the evidence produced by the Commonwealth was insufficient, as a

matter of law, to prove beyond a reasonable doubt that she committed the offenses.  Finding no

error, we affirm the judgment of the trial court.

        "We have held in many cases that, upon appellate review, the evidence and all reasonable

inferences flowing therefrom must be viewed in the light most favorable to the prevailing party

in the trial court."  Commonwealth v. Hudson, 265 Va. 505, 514, 578 S.E.2d 781, 786 (2003)

(citations omitted).  Further, "[c]ircumstantial evidence is as competent and is entitled to as much

weight as direct evidence, provided it is sufficiently convincing to exclude every reasonable

_____

        [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.
Furthermore, because this opinion has no precedential value, we recite only those facts essential
to our holding.

hypothesis except that of guilt." Coleman v. Commonwealth, 226 Va. 31, 53, 307 S.E.2d 864, 876 (1983). "The statement that circumstantial evidence must exclude every reasonable theory of innocence is simply another way of stating that the Commonwealth has the burden of proof beyond a reasonable doubt." Hudson, 265 Va. at 513, 578 S.E.2d at 785 (citation omitted). In addition, "[c]ircumstantial evidence is not viewed in isolation. 'While no single piece of evidence may be sufficient, the "combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion."'" Id. at 514, 578 S.E.2d at 786 (quoting Derr v. Commonwealth, 242 Va. 413, 425, 410 S.E.2d 662, 669 (1991) (citations omitted)). Thus, the issue upon appellate review is "whether a reasonable jury, upon consideration of all the evidence, could have rejected" Morton's theories of defense and found her guilty of the offenses charged, beyond a reasonable doubt. Id. at 513, 578 S.E.2d at 785. "When a jury decides the case, Code § 8.01-680 requires that 'we review the jury's decision to see if reasonable jurors could have made the choices that the jury did make. We let the decision stand unless we conclude no rational juror could have reached that decision.'" Crowder v. Commonwealth, 41 Va. App. 658, 662, 588 S.E.2d 384, 386 (2003) (quoting Pease v. Commonwealth, 39 Va. App. 342, 355, 573 S.E.2d 272, 278 (2002) (en banc)).

Moreover, "[c]onflicting expert opinions constitute a question of fact . . . ." McCaskey v. Patrick Henry Hospital, 225 Va. 413, 415, 304 S.E.2d 1, 2 (1983). It is within the province of the jury, as the finder of fact, "to assess the credibility of [such] witnesses and the probative value to be given their testimony." Richardson v. Richardson, 242 Va. 242, 246, 409 S.E.2d 148, 151 (1991); see also Mercer v. Commonwealth, 259 Va. 235, 242, 523 S.E.2d 213, 217 (2000). Thus, the jury's factual determinations in this regard "are binding on this Court, and we will reverse such findings 'only if they are plainly wrong or without evidence to support them.'"

Mercer, 259 Va. at 243, 523 S.E.2d at 217 (quoting Richardson, 242 Va. at 246, 409 S.E.2d at 151).

So viewed, we find the evidence presented here was sufficient, as a matter of law, to prove beyond a reasonable doubt that Morton committed the offenses for which she was convicted.

"Assault and battery, . . . requires proof of 'an overt act or an attempt . . . with force and violence, to do physical injury to the person of another,' 'whether from malice or from wantonness,' together with 'the actual infliction of corporal hurt on another . . . wil[l]fully or in anger.'" Boone v. Commonwealth, 14 Va. App. 130, 132, 415 S.E.2d 250, 251 (1992) (citations omitted). It has long been the rule in Virginia that "[a]ny touching by one of the person . . . of another in rudeness or in anger is an assault and battery." Lynch v. Commonwealth, 131 Va. 762, 765, 109 S.E. 427, 428 (1921). Nevertheless, "[o]ne cannot be convicted of assault and battery 'without an intention to do bodily harm — either an actual intention or an intention imputed by law . . . .'" Boone, 14 Va. App. at 133, 415 S.E.2d at 251.

Code § 18.2-371.1(B)(1) provides that "[a]ny parent, guardian, or other person responsible for the care of a child under the age of 18 whose willful act or omission in the care of such child was so gross, wanton and culpable as to show a reckless disregard for human life shall be guilty of a Class 6 felony." We discussed the application of this statute in Barrett v. Commonwealth, 41 Va. App. 377, 585 S.E.2d 355 (2003), and described the statutory terms as follows:

> "[T]he term 'gross, wanton, and culpable' describes conduct. The word 'gross' means 'aggravated or increased negligence' while the word 'culpable' means 'deserving of blame or censure.' [Bell v. Commonwealth, 170 Va. 597, 611, 195 S.E. 675, 681 (1938)].
> '"Gross negligence" is culpable or criminal when accompanied by

> acts of commission or omission of a wanton or wilful nature, showing a reckless or indifferent disregard of the rights of others, under circumstances reasonably calculated to produce injury, or which make it not improbable that injury will be occasioned, and the offender knows, or is charged with the knowledge of, the probable result of his acts.' Id. at 611-12, 195 S.E. at 681."

41 Va. App. at 400, 585 S.E.2d at 366-67 (quoting Cable v. Commonwealth, 243 Va. 236, 240, 415 S.E.2d 218, 220 (1992)) (alterations in original).

> "We have defined the term 'wilful' as[:]

> an act done with a bad purpose, without justifiable excuse, or without ground for believing it is lawful. The term denotes '"an act which is intentional, or knowing, or voluntary, as distinguished from accidental."' The terms 'bad purpose' or 'without justifiable excuse,' while facially unspecific, necessarily imply knowledge that particular conduct will likely result in injury or illegality."

Id. (quoting Ellis v. Commonwealth, 29 Va. App. 548, 554, 513 S.E.2d 453, 456 (1999) (citations omitted)).

When viewed in the light most favorable to the Commonwealth, the evidence here established that Morton was a regular caregiver for the Blevins's four-and-a-half-month-old baby for several months prior to the incident. On the morning of July 20, 2001, Mr. Blevins, the baby's father, dressed the baby and took the baby to Morton's home as usual. Mr. Blevins testified the baby was acting normally that morning and was "smiling" and "kicking." By her own concession to Investigator Edward Kopacki, Morton established that the baby continued to act normal that morning, "was good all day" and "ate almost all of her first couple of bottles" without incident. Later that afternoon, during the baby's feeding, Morton conceded that she "grabbed the baby by the ankles," turned her "upside down," and "shook her," because she thought the baby might be choking on milk. Although Morton contended that she shook the baby "lightly," the jury was entitled to evaluate Morton's theory of innocence upon consideration

- 4 -

of all the evidence and the reasonable inferences that flowed therefrom. It is clear that, in doing this, the jury rejected Morton's claim as unreasonable.

Indeed, the medical evidence established that, when the baby arrived at the hospital that afternoon, she suffered from a chronic subdural hematoma, as well as a fractured tibia. Dr. Chris Woobilin, the pediatric emergency room physician who examined the baby, testified that a chronic subdural hematoma would appear on an x-ray within 24 to 48 hours after an injury. Dr. Robin Foster, the pediatric physician with MCV who examined the baby approximately three days later on July 23, 2001, testified that the baby's chronic subdural hematoma would appear as a result of blood collections that are "greater than approximately two weeks of age." However, Dr. Foster further testified that MCV physicians found the baby to suffer from not only the chronic subdural hematoma and the fractured tibia, but also from an acute subdural hematoma and multilayered retinal hemorrhages. Dr. Foster opined that the acute hematoma would appear "within 72 hours" of the causal injury, and explained that the amount of force to cause such an injury "has to be severe and would be deemed violent even[] to a lay person." Significantly, Dr. Foster testified that, in her opinion, "an acute event is what triggered [the baby's] clinical presentation of going limp and being less responsive than normal." She stated that once the acute "injury occur[red] . . . [she] would not expect that [the baby] would eat normally . . . or that she would be alert and playful and interactive."

Dr. Foster further testified that the baby's fractured tibia appeared to be an "acute" injury which would have likely occurred within 72 hours prior to July 23, 2001. She stated that the force required to cause such a fracture "would be significant," "it would not be a mild force."

Dr. John Wright, a pediatric ophthalmologist with MCV, testified that the baby's retinal hemorrhages were also "acute" and thus, would have occurred within a time frame of one week,

or up to nine days, prior to the baby's examination. He stated that the force required to cause such hemorrhages would be "extreme."

Each of the three doctors testifying for the Commonwealth opined that the combination of the baby's injuries was consistent with "shaken baby syndrome." In fact, Dr. Wright stated that "shaken baby syndrome [was] the *only* likely basis for [the baby's] retinal hemorrhages." (Emphasis added.)

We recognize the validity of Morton's contention on appeal that "mere opportunity to commit an offense raises only 'the suspicion that the defendant may have been the guilty agent; and suspicion is never enough to sustain a conviction.'" Christian v. Commonwealth, 221 Va. 1078, 1082, 277 S.E.2d 205, 208 (1981) (quoting Simmons v. Commonwealth, 208 Va. 778, 783, 160 S.E.2d 569, 573 (1968)). However, we likewise recognize that opportunity is a relevant circumstance, "and, when reinforced by other incriminating circumstances, may be sufficient to establish criminal agency beyond a reasonable doubt." Id. "Moreover, where it appears that a criminal assault was made upon a child within a particular period of time, evidence which shows that the accused was sole custodian of the child during that period may be sufficient, standing alone, to prove criminal agency." Id.

The evidence in the case at bar clearly established that Morton was the only adult present with the baby when her symptoms of "limpness" and unresponsiveness first appeared. Furthermore, Morton was the only adult present with the baby for several hours prior to the appearance of the symptoms. Additionally, evidence established that the baby was fine and appeared to be acting and eating normally, up to the time that her symptoms first became apparent. In light of the testimony concerning the time frame within which the injury likely occurred, as well as Dr. Foster's testimony that the baby's symptoms would have been caused by an "acute" event and that the baby would not have behaved normally, eaten normally, or have

been playful and interactive after such an injury had occurred, we find that credible evidence supported the jury's finding that Morton inflicted the baby's acute head injury.

Moreover, each of the doctors testifying for the Commonwealth explained that the force necessary to cause such an injury would be "severe" and "violent," even as interpreted by a layperson. In light of this fact, as well as the testimony concerning the likely timing of the retinal hemorrhaging and the tibial fracture, we find the evidence was similarly sufficient to establish that Morton inflicted the baby's leg fracture and retinal hemorrhaging.

Further, considering the testimony concerning the amount of force necessary to cause each of the injuries suffered by the baby, the evidence also clearly established that the injuries were inflicted by Morton "in rudeness or in anger," Lynch, 131 Va. at 765, 109 S.E. at 428, with force and violence, and with reckless disregard for the baby's well-being. See Barrett, 41 Va. App. at 400, 585 S.E.2d at 366-67; Boone, 14 Va. App. at 133, 415 S.E.2d at 251; see also Hernandez v. Commonwealth, 12 Va. App. 669, 672, 406 S.E.2d 398, 400 (1991) ("A trier of fact may infer that a person intends the natural consequences of his or her acts."); Campbell v. Commonwealth, 12 Va. App. 476, 485, 405 S.E.2d 1, 5 (1991) (en banc) (citations omitted) ("In determining the probable consequences of an aggressor's actions and his or her intent to achieve those consequences, the comparative weakness of the victim and the strength of the aggressor may be considered. Where a victim is significantly weaker than an aggressor, a physical attack is more likely to cause severe bodily injury.").

Morton's contention that the baby suffered from BESSI (a benign enlargement of the subarachnoid space), and therefore could sustain head trauma as a result of lesser force, does not persuade us differently. Indeed, although the defense experts testified that the baby suffered from BESSI, the Commonwealth's experts testified that the baby's medical and physical histories were not consistent with the condition. Moreover, at least one of the Commonwealth's

experts testified that, even assuming the baby suffered from BESSI, the condition would not put a child at greater risk of suffering a head injury. None of the experts, including the defense experts, testified that BESSI would put a child at greater risk of suffering retinal hemorrhaging or a fractured tibia. Furthermore, even the defense experts agreed that whether or not the baby suffered from BESSI, some force - "something more significant than a bump or, in the road or something of that nature" - would be required to have caused the baby's head trauma.

Finally, Morton's claim that the baby suffered only from a "rebleed," as a result of the chronic subdural hematoma, which could have been caused by lesser force than would normally be required, likewise does not persuade us. Dr. Foster testified that the baby's chronic subdural hematoma "did not appear to be rapidly changing." Thus, she opined that "an acute event" "triggered" the baby's symptoms. She stated that a "second incident of some sort" would have been required to cause the acute subdural hematoma. As Dr. Foster opined that causing an acute subdural hematoma would require "severe," "violent" force, the jury could have reasonably concluded that the force inflicted by Morton, even if less severe than that normally required, was sufficient to establish intentional, willful conduct in reckless disregard for the baby's well-being. See Feigley v. Commonwealth, 16 Va. App. 717, 724, 432 S.E.2d 520, 525 (1993) (noting that if the evidence is equally susceptible to two or more constructions, one of which would support guilt and another which would not, the fact finder is not free arbitrarily to select the theory of guilt, *but that this analysis occurs only after the fact finder resolves all conflicts in the evidence*); see also Hudson, 265 Va. at 513, 578 S.E.2d at 785 (noting that this Court must determine "not whether 'there is some evidence to support'" a defendant's hypothesis of innocence, but rather, "whether a reasonable jury, upon consideration of all the evidence, could have rejected [the defendant's] theories in his defense and found him guilty . . . beyond a reasonable doubt").

Given the totality of this evidence, we find that the jury was entitled to reject Morton's explanations of innocence and to conclude that the evidence was sufficient to establish she inflicted the baby's injuries with the requisite state of mind. Accordingly, we affirm Morton's convictions.

<u>Affirmed.</u>