## Richmond

GORDON A. BELL V. COMMONWEALTH OF VIRGINIA.

March 10, 1938.

Present, All the Justices.

598

The opinion states the case.

*Amos C. Crounse,* for the plaintiff in error.

*Abram P. Staples, Attorney-General,* and *Joseph L. Kelly, Jr., Special Assistant,* for the Commonwealth.

SPRATLEY, J., delivered the opinion of the court.

This case presents the question of the degree of negligence required to convict one of involuntary manslaughter where the homicide is alleged to have been caused by the negligent operation of an automobile.

Gordon A. Bell, the plaintiff in error, who will be hereinafter referred to as the defendant, was indicted for manslaughter. The indictment was in the short or statutory form, Code 1936, section 4865, and charged the defendant "did on February 1, 1937, in said county of Arlington, Virginia, feloniously kill and slay one, Jessie Cooley, against the peace and dignity of the Commonwealth."

Upon his arraignment, he entered a plea of not guilty, and moved the court to require the Commonwealth to furnish him with a bill of particulars, which motion the court granted.

The bill of particulars sets out the following specifications: "That at the time and place laid in the indictment now pending against the said Gordon A. Bell, he did operate a motor vehicle recklessly and unlawfully, in that he then and there

operated the said motor vehicle at a rate of speed in excess of a lawful rate of speed; that he drove the said motor vehicle upon the left of the center of the street or highway; that he operated said motor vehicle, without any headlights, or with headlights which failed to comply with the requirements of the law of Virginia; that he failed to have the said motor vehicle under proper control or to keep a proper lookout for the safety of other persons using the said highway; that he drove the said motor vehicle at a speed that was greater than reasonable and proper, having due regard to the traffic, surface and width of the highway, and other conditions existing at the said time and place, and at such a speed as to endanger the life of persons on the said highway; and that while so unlawfully operating the said motor vehicle, it struck and injured the person of one Jessie Cooley, from which injuries she died."

Upon motion of the defendant for further and more definite specifications, the Commonwealth amended its bill of particulars by further setting forth the place where the crime was alleged to have been committed and the direction in which the defendant was driving. The trial court refused to grant a motion for a more definite bill. To this refusal, the defendant excepted, and this exception constitutes one of his assignments of error.

The case then proceeded to trial, and a jury, upon the evidence and instructions given by the court, found the defendant guilty of involuntary manslaughter, and fixed his punishment at two and one-half years in the penitentiary.

The defendant moved the trial court to set aside this verdict, and to grant a new trial on the grounds that it was contrary to the law and the evidence, contrary to the instructions of the court, and for error in the granting, in the refusing, and in the amending of certain instructions. This motion the court denied, and sentence was thereupon pronounced against the defendant in accordance with the verdict of the jury.

To sustain a charge of involuntary manslaughter, the Commonwealth presented the following evidence.

On the night of February 1, 1937, there was a benefit card party at the community house in Clarendon, a thickly settled community, attended by quite a number of people. The community house is located on the east side of N. Irving street, near the intersection of that street with North Wilson and North Washington Boulevards. N. Irving street is twenty-five feet wide, and runs north and south. North Wilson Boulevard runs northeast and southwest, and North Washington Boulevard runs northwest and southeast. The lot on which the community house is located is in a long city block, extending 525 feet southerly from the above described intersection to N. Tenth street, another intersecting street. On the east side of N. Irving street a sidewalk extends from the north end of the block about 118 feet to a point in front of the community house. Beyond this, going south on the same street, there is no sidewalk, but there is a ditch or gutter marking a division line between the street and the adjoining property.

On the day in question, it had been raining, and the ground to the east of the street was muddy. There were automobiles parked on both sides of the street, and extending on the east side thereof to the community house, leaving a space in the center of the street thirteen feet wide for traffic. The street was unlighted between the intersections.

A few minutes before 12 o'clock on that night, the card party ended, and the participants left, some going to their parked automobiles to return home. Among those so leaving were the now deceased, Mrs. Cooley, and three companions, Mrs. Grace Dagger, Mrs. Bertha Warner and Mrs. Lillian Johnson. These four women came out of the community house, and stepped immediately into N. Irving street, turned left, and began walking southerly, two abreast, down the left-hand or east side of the street. The two couples were five or six feet apart, and the two ladies on the inside walked as close as possible to the parked cars, with Mrs. Dagger on the outside of the front couple and Mrs. Cooley on the outside of the rear couple. The two women in each pair walked closely together, their elbows within

touch. While so walking, and when they had reached a distance about 200 feet from the community house, Mrs. Cooley and Mrs. Dagger, the outside women of both pairs, were struck from the rear and knocked down by the defendant's automobile, which was being operated to the left of the center of the street. Neither of the three surviving women heard any warning signal, nor saw any lights on the automobile or any reflection therefrom on the street. They say that the road was entirely dark at the point of the collision. Mrs. Warner, who was the companion on the left of Mrs. Cooley, says she received her first impression of the approach of the car when she turned her head to speak to Mrs. Cooley, and that the car struck the latter at that moment.

Two other witnesses, Mrs. Julia Thomas and Elmer Jacobs, testified that they, too, had left the card party at its conclusion, and after getting to the end of the sidewalk on the east side of N. Irving street, in front of the community house, they started directly and immediately across that street to the west side thereof. When they reached the center of the street, they noticed an automobile coming from their right without lights, and they safely hurried across. They estimated that the automobile was then running at a speed of from eighteen to twenty miles per hour. They turned to watch it pass, and Mrs. Thomas called out to the driver, "Where are your lights?" She received no answer, and the car continued its course. While they were speaking to each other about the car being without lights, and within "a few seconds," they heard a crash ahead of them. The crash appeared to be at a distance variously estimated by them at from sixty to 100 feet away. If they were at a point directly opposite the community house, the actual distance, as shown by a survey, to the place of the accident would be 205 feet. These two witnesses proceeded to the place of the crash, and there saw Mrs. Cooley and Mrs. Dagger lying on the street and the defendant's car stopped close thereby.

A police officer soon came up, and, taking charge of the situation, found that the lights on the defendant's car were out and could not be turned on. He also found its left front headlight lamp had been tilted upward, but was not broken.

All of the above witnesses agree that the defendant wore a sweater or lumber jacket, which enclosed his right arm in the body of the jacket rather than in the right sleeve, and that it was fastened so that only the right hand was exposed to the wrist below the lower part of the jacket. It further appeared that the defendant had injured his right arm in a fall some two weeks before the occurrence.

Mrs. Cooley and Mrs. Dagger were taken to a hospital, and after securing medical services, were allowed to return to their respective homes, it being thought that they had received only superficial injuries. Shortly after returning home, Mrs. Cooley became ill, sank into a coma, and died about 4:30 a. m. The autopsy disclosed a ruptured artery in the tissue surrounding the brain and a blood clot producing pressure on the brain.

At the conclusion of the Commonwealth's evidence, the court overruled the motion of the defendant to strike the evidence.

The defendant showed in the evidence that he was the owner of a model 1934 Ford coupe, which was being driven by him that night. He was accompanied by Mrs. Eva Wright, with whom he boarded, and whom he was returning home from a moving picture performance attended by her. His automobile had been regularly inspected under the laws in this State as late as November, 1936, at which time his headlights had been found to need adjustment, and had been adjusted.

He stated that about 8:00 o'clock that night, and again at 10:00 o'clock, he had operated his automobile along N. Irving street, past the point of the accident in proceeding twice to Clarendon, and that at both times his headlights were burning properly. Prior to leaving North Wilson Boulevard, where he had taken up Mrs. Wright for the

fatal trip, and immediately prior to entering N. Irving street, on this trip, both he and Mrs. Wright and two other witnesses testified that the headlights of his car were burning brightly. He says that he first saw Mr. Jacobs and Mrs. Thomas in the street in front of him about three feet from the parked cars on his right side, at which time he was running between fifteen and eighteen miles an hour, and that he swerved his car to his left to avoid striking them, and continued at a speed of twelve or fifteen miles an hour; that before he could get back to the right side of the center of the road he saw immediately in front of him two women, who had apparently stepped out from between the automobiles parked on the street; that while he did not have an opportunity to change the direction of his car, he did attempt to stop it; that before he could do this, he struck one of the women, who was apparently knocked against the other woman; that he stopped his car immediately; and then noticed the lights on the machine were out, and could not be switched on, although he got a slight flash from trying to switch them on. He had not used the car for the prior two weeks, because of tire trouble. He claimed that his right arm was free, and was not enclosed within the body of his jacket, as the jacket was thrown over his shoulders, and not fastened; and that he was driving with both hands. He also stated that Jacobs and Mrs. Thomas were some distance below the community house, as opposed to their statement that they were almost directly in front thereof, and that he did not hear Mrs. Thomas call out to him about the lack of lights.

Mrs. Eva Wright, the passenger in the defendant's car, stated that the lights were burning when they entered the car to return home, and were burning as they proceeded along N. Irving street, until the time of the accident. She testified that the two women, who were struck down, walked out from between the cars parked on the street, into the side of the car driven by the defendant, and she was certain that they were not walking south on the street. She did not, however, see Mrs. Thomas or Mr. Jacobs, nor did she

observe the defendant swing or swerve his car to the left side of the road.

An automobile mechanic, who examined the defendant's car some days after the collision, said that when he began work on it the headlight bulbs had already been replaced, but would not burn; that he found the light fuse burned out, an exposed wire and a loose connection in the light wiring system. He said that while it did not always occur that both fuse and light bulbs would burn out at the same time, it had been known to occur, the fuse being for the protection of the light bulbs.

Upon the completion of all of the evidence, the defendant again moved the court to strike out the Commonwealth's evidence as insufficient to sustain a conviction, and assigned as grounds therefor the following: (1) That the conduct of the defendant did not amount to gross and culpable negligence; (2) that the evidence did not show that the defendant had knowledge that his automobile was without lights, if, in fact, it was prior to the accident without lights; and (3) that the evidence of the Commonwealth showed that the defendant was driving his car at a proper and lawful rate of speed, and was forced to operate it on the left side of the center of the road because persons were unlawfully using the highway. The court overruled the motion.

The defendant relies upon nine assignments of errors in his argument for the reversal of the judgment of the trial court.

The first assignment of error relates to the refusal of the court to require the Commonwealth, in its bill of particulars, to specify with greater particularity the elements of the offense alleged, and to designate the specific charge upon which the Commonwealth intended to prosecute. The defendant contends that since the various acts of negligence allege separate criminal offenses, they should have been alleged in separate counts or paragraphs, and the Commonwealth should have been required to designate which charge it would rely upon.

In support of the above contention, the defendant cites the case of *Pine et al.* v. *Commonwealth,* 121 Va. 812, 93 S. E. 652. That case held that except in the single case of an indictment under the prohibition law, then in force in Virginia, there cannot be more offenses than there are counts in the indictment, and if the Commonwealth offers evidence of more than one, the proper practice is for the defendant to ask the court to compel the Commonwealth to elect the one it will prosecute.

The answer to the defendant's contention is clear. The defendant here was not being tried for violation of the motor vehicle laws. In the instant case, the indictment contained only one count, and that was for manslaughter. A conviction was sought only on that count for involuntary manslaughter. The bill of particulars objected to was not a count or several counts. It was a statement of the several acts of negligence alleged to have existed in creating the offense. It recited an accumulation of negligent acts, each based, more or less, on the other, or proceeding one upon the other, to show an attitude of indifference to consequences, or a reckless, wanton and callous disregard of the rules of safety.

In determining whether or not one is guilty of gross and culpable negligence, it is important to consider the cumulative effect of a series of connected, or independent negligent acts, out of which arise the injuries, as showing the attitude of the offender. All of the immediate acts and actions of the offender presenting a causal relation to the injury and a part of the *res gestae* are pertinent to the inquiry. A disregard of all, or of several simple and primary rules of conduct prescribed by law for the benefit of society becomes the more aggravated as the disregard increases in extent. If each of the violations of law alleged in the bill of particulars followed immediately one upon the other, and contributed or concurred in producing the injury, each would be a factor in determining the degree and character of negligence committed. The bill of particulars, therefore, only sets out the means whereby the alleged offense of in-

voluntary manslaughter was committed, and the constituent elements of the gross and culpable negligence relied on. In this respect, it gave notice to the defendant of the charge he would be required to meet and defend.

The defendant did not move the court at the conclusion of all of the evidence to elect or specify the acts of negligence which the Commonwealth relied on to constitute gross and culpable negligence.

The three assignments of error, which relate to the refusal of the court to strike the evidence of the Commonwealth, and to set aside the verdict of the jury as contrary to the law and the evidence, present the question as to whether the verdict is supported by the law and the evidence.

In some States, it is held that the breach of a statute is negligence *per se,* and that if there is a causal connection between the disregard of the statute and the injury inflicted, and such negligence is the proximate cause of the injury, it is sufficient to constitute manslaughter. 5—Am. Jur. 923; 99 A. L. R. 772; *State* v. *Wilbanks,* 168 La. 861, 862, 123 So. 600.

This court, in the absence of statute, has defined involuntary manslaughter in substantially the terms uniformly adopted in this country. In *Mundy* v. *Commonwealth,* 144 Va. 609, 131 S. E. 242, 244, Judge Chichester approves the following definition: " 'Involuntary manslaughter is the killing of one accidentally, contrary to the intention of the parties, in the prosecution of some unlawful, but not felonious, act; or in the improper performance of a lawful act.' " (Cases cited.)

Mr. Chief Justice Prentis, in *Goodman* v. *Commonwealth,* 153 Va. 943, 151 S. E. 168, 171, after discussing the application of this definition to a homicide committed in the operation of a motor vehicle says:

"The precise grade of such a homicide, whether murder or manslaughter, depends upon the facts of the particular case. One, however, who accidentally kills another, even though he may be chargeable with some actionable

negligence, is not guilty of a crime, unless his negligence is so gross and culpable as to indicate a callous disregard of human life and of the probable consequences of his act. The crime is imputed because of recklessness, and where there is no recklessness there is no crime."

The courts and the authorities agree, in the absence of statutory regulations, that a higher degree of negligence is required to establish criminal negligence than to establish liability in a civil action. The negligence required in a criminal proceeding must be more than the lack of ordinary care and precaution. It must be something more than mere inadvertence or misadventure. It is a recklessness or indifference incompatible with a proper regard for human life. It must be shown that a homicide was not improbable under all of the facts existing at the time, and that the knowledge of such facts should have had an influence on the conduct of the offender. 99 A. L. R. 829; 5 Am. Jur. 927; *Cain* v. *State,* 55 Ga. App. 376, 190 S. E. 371.

It is most difficult to define and to determine "gross and culpable negligence" in brief terms applicable to every situation. No completely satisfactory definition covering every situation has yet been given. The definitions given are restricted almost invariably to the facts of the particular case. The term "gross and culpable negligence" is descriptive of conduct. The very nature of the word "gross" indicates that it is more than mere or ordinary negligence,—it is an aggravated or increased negligence. It is such negligence as may be often best evidenced by a series of acts of commission or omission indicating a state of mind or lack of thought of the offender. The commissions or omissions may be dependent, independent, interdependent, or cumulative, provided there is some causal relation to the state of the mind, or to the acts of the offender with the offense charged. The word "culpable," in popular use and acceptation, means deserving of blame or censure. "Gross negligence" is culpable or criminal when accompanied by acts of commission or omission of a wanton or wilful nature,

showing a reckless or indifferent disregard of the rights of others, under circumstances reasonably calculated to produce injury, or which make it not improbable that injury will be occasioned, and the offender knows, or is charged with the knowledge of, the probable result of his acts.

When we reach the question, whether or not the evidence of the Commonwealth is sufficient to justify a verdict of involuntary manslaughter, we must consider that evidence in the light most favorable to the Commonwealth, since the jury's verdict is final as to the conflicts arising in the testimony.

The evidence shows that the defendant, at the time of and immediately before the accident, was driving his car without lights, or without proper lights, on the left-hand side of a dark street, with a partially disabled right arm confined closely to his side. The parking of other cars on both sides of the street, the presence of other persons on the street and in the vicinity when the card party was breaking up, were circumstances bringing home to him knowledge that he might expect people to be on the street. The width of the driveway was narrowed to thirteen feet, but was otherwise unobstructed. The circumstances made the situation exceptionally risky and dangerous, and pointed to the constant risk and danger of any person using the narrow driveway, presenting a need for the exercise of great care in the operation of an automobile. In this narrow space, four women, two abreast, had walked for a distance of 200 feet on their left side of the street, and for at least the greater portion of that distance, the defendant had proceeded in the same direction, and if his lights had been burning properly, he could and should have seen them.

The defendant contends that the evidence did not show that he knew his lights were not burning. It is impossible for us to believe that a normal man can drive a motor vehicle under the conditions herein recited, and not observe the lights of his car go out, if he pays the slightest attention to the operation of his car. If he was looking where

he was going on this street, on this dark night, he was bound to have seen the change made from burning bright headlights to the absence of lights. That he struck the two women on the outside of the pairs, and did not see their two companions, further shows a lack of proper lights. That the women did not immediately walk out from between the parked cars into the side of his car, is corroborated not only by their evidence, but by the tilted condition of his left front headlight, and by the position in which the injured women were found lying in the street. The condition of the headlight after the mishap and the condition of the wires of the lighting system on the car, do not controvert the evidence that the lights were not burning as the car proceeded along N. Irving street.

A common knowledge of the added hazards upon the public highways, through the increased use thereof by motor vehicles, makes it highly necessary that the simplest of safeguards provided by law for the protection of the public, should be observed and followed.

There was a disregard both of the positive rules of law and of the ordinary rules of safety. The injuries inflicted upon the deceased were not improbable, and might have been reasonably anticipated under the circumstances existing at the time. The knowledge of these surrounding circumstances should have reasonably influenced the conduct of the defendant. There was ample evidence to justify the jury in believing that the defendant was guilty of such a callous indifference or disregard of the rules of law and safety, and of the rights of others, as was incompatible with a proper regard for human life, and amounted to gross, wanton and culpable misconduct.

Another assignment of error relates to the giving of instruction number one at the instance of the Commonwealth. This instruction simply defines, according to the provisions of the State Motor Vehicle Code, Code 1936, section 2154(48) *et seq.*, certain acts as constituting reckless driving and recites the legal requirement for lights on automobiles. It does not undertake to define manslaughter,

or to say that the defendant was guilty of involuntary manslaughter, or of reckless driving. It merely tells the jury that for the protection of the public, certain acts in driving a motor vehicle are made unlawful. It does not state that the defendant was guilty of any such unlawful acts, or deny to him the right to justify or defend any alleged violation.

There were other instructions given, which defined involuntary manslaughter, and repeatedly told the jury that the defendant could not be convicted of such an offense unless he were guilty of gross, wanton and culpable negligence. Whether the defendant was guilty of several cumulative acts of negligence bearing a causal relation to the injury inflicted is material on the question of gross and culpable negligence. The violation of a positive law, or the commission of an act expressly prohibited, is *prima facie* unlawful, but this does not prohibit the defendant from showing a provocation or emergency which produced such act, if either a provocation or emergency existed. Such proof is a matter of defense.

The defendant objects to instruction number two, on the ground that it does not tell the jury that the negligence of the defendant must be so gross and culpable as to show a callous disregard of the rights of others using the highway. This instruction first gives the uniform definition of involuntary manslaughter, as adopted by this court in *Mundy* v. *Commonwealth, supra*. To this it adds, in conformity with the principle enunciated in *Goodman* v. *Commonwealth, supra*, that the killing must be "accompanied by such carelessness or recklessness on the part of the accused as is incompatible with a proper regard for human life." The instruction further recited that if the recklessness and carelessness above referred to is committed both in violation of positive laws and under "circumstances reasonably calculated to result in injuries to others," this is sufficient negligence to constitute the offense. It leaves to the jury the question, whether or not such circumstances existed.

To carelessly and recklessly commit an act in violation of law, which in itself is reasonably calculated to injure

another, and to continue to pursue such action, after circumstances bring further notice of the danger and risk, accentuates and aggravates the nature of the careless and reckless action, and amounts to wantonness, if not wilful misconduct.

The objection which the defendant makes to this instruction is removed by the fact that in at least three instructions, given at the request of the defendant, in language which may be clearly and easily understood, the jury was told that the degree of negligence relied on to convict the defendant of involuntary manslaughter must be more than ordinary negligence, and must indicate a gross and callous disregard of human life. While repeated in instructions B and J, it is set out in instruction A, in no uncertain terms, as follows:

"The Court instructs the jury that the gist of the crime charged against the defendant is criminal negligence; by the term criminal negligence is meant not simply such negligence as might be the foundation of a suit for damages by the person injured or by his personal representatives if killed, but something more than that; in order to be criminal negligence, as distinguished from such negligence as is necessary for a civil damage action, it must be shown that the negligence of the accused was gross or culpable negligence; culpable or gross negligence is that which indicates a callous disregard of human life and of the probable consequence of his act; criminal liability cannot be predicated upon every act carelessly performed merely because such carelessness results in the death of another, but in order for criminal liability to result from negligence, it must necessarily be reckless or wanton and of such a character as to show disregard of the safety of others under circumstances likely to cause injury or death; the crime is imputed because of recklessness, and where there is no recklessness, there is no crime."

There is no merit in the assignment of error to the action of the trial court in striking out the word "utter" which qualifies the word "disregard" in the last part of

instruction A, as originally offered. The word "utter" as defined in the lexicons, and as understood in ordinary and common acceptance, means total, complete and entire. The disregard need not go to the extent implied by the use of the word "utter." The disregard need not be wilful, or intentional. In this type of offense neither intention or malice is a necessary element of the crime. The instruction, as given, sufficiently shows the nature of the disregard to constitute criminal liability.

Instruction F was properly refused by the trial court. That instruction undertook to tell the jury that the defendant was not guilty, if the deceased was guilty of contributory negligence. All of the authorities agree that contributory negligence has no place in a case of involuntary manslaughter. This case is one of the State against the defendant, and not one of a party seeking damages in a civil action. The conduct of the decedent may have a material bearing on the degree of the defendant's guilt, but if the criminal negligence of the latter is found to be the cause of the death, the defendant is criminally responsible, whether the decedent's failure to use due care contributed to the injury or not.

Evidence of the conduct of the deceased, so far as it was material and affected the actions of the defendant, was admitted in evidence; and the jury, in another instruction, was correctly told the effect of such conduct, if proved.

In 99 A. L. R. 833, in an annotation, under the subject, "Homicide or an assault in connection with negligent operation of an automobile," may be found the following clear statement of this principle:

"The rules of law concerning contributory negligence as a defense in civil actions for damages for personal injuries have no application to homicide cases based on criminal negligence in operating an automobile. The decedent's behavior is admissible in evidence, and may have a material bearing on the question of the defendant's guilt, for a homicide due solely to the negligence of the decedent imposes no criminal liability on the driver of the automobile which

killed him. But if the culpable negligence of the defendant is found to be the cause of the death, he is criminally responsible whether the decedent's failure to use due care contributed to the injury or not."

See also, 5 Am. Jur., page 930, section 796, to the same effect.

In the instant case, instructions given at the request of the defendant presented to the jury the theory of the defense, that the injuries were caused by reason of an emergency not created by him. These instructions also correctly directed the jury to consider whether or not the homicide was caused by misadventure, unavoidable accident, or by some supervening cause, for which the defendant was not responsible.

The last assignment of error relates to the refusal of the court to give defendant's instruction I. The language of this instruction, as tendered, is so extended and confusing that it is difficult for us, and it would have been difficult, if not impossible, for the jury to ascertain its meaning and extent. It is also erroneous in part, in that it undertakes to require the jury to find whether the homicide was caused solely by one or the other of two alleged acts of negligence, selected by the defendant from among several acts alleged by the Commonwealth to make up and constitute in their cumulative effect, gross, wanton and criminal negligence. It was not error to refuse this instruction.

The instructions, as given, when taken and read together as a whole, fairly and fully presented the theories of both the Commonwealth and the defendant. The nature and elements of the negligence required to establish the guilt of the accused, were clearly and repeatedly stated, and even emphasized in several instructions. When read in connection with the facts of this particular case, and in connection with each other, they correctly set out the law applicable thereto.

The jury and the trial judge both saw and heard the witnesses testify. With this advantage, they were enabled to give proper credit and value to the evidence. The jury has

said that the defendant was guilty of wanton and culpable negligence, resulting in the death of a human being. The trial court has refused to disturb that verdict. The record shows that the defendant has had a fair trial on the merits. We are unable to discover any error or prejudice to his rights.

The judgment of the trial court is affirmed.

*Affirmed.*