COURT OF APPEALS OF VIRGINIA


Present:    Judges Elder, Beales and Retired Judge Benton[*]
Argued at Alexandria, Virginia


RUSSELL KILBY

                                                    MEMORANDUM OPINION[**] BY
v.        Record No. 1426-06-4            JUDGE RANDOLPH A. BEALES
                                                          OCTOBER 2, 2007
COMMONWEALTH OF VIRGINIA


              FROM THE CIRCUIT COURT OF CULPEPER COUNTY
                              John R. Cullen, Judge

           Mark S. Gardner (Gardner, Maupin, Sutton & Haney, P.C., on brief),
           for appellant.

           Robert H. Anderson, III, Senior Assistant Attorney General
           (Robert F. McDonnell, Attorney General, on brief), for appellee.


        Russell Kilby (appellant) appeals from his convictions on one count of cruelty and injury

to a child in violation of Code § 40.1-103(A) and three counts of contributing to the delinquency

of a minor in violation of Code § 18.2-371.  The sole issue contemplated in this appeal is the

sufficiency of the evidence to sustain those convictions.[1]  For the reasons that follow, we affirm

appellant's convictions.

---

        [*] Judge Benton participated in the hearing and decision of this case prior to the effective
date of his retirement on October 1, 2007.

        [**] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

        [1] Appellant's counsel was appointed, by order of this Court, on January 3, 2007 and given
thirty days to file a supplemental petition.  On February 7, 2007, after the deadline for filing a
supplemental petition had passed, counsel filed a motion praying for an extension of time to file
the supplemental petition.  That motion was denied since it was not timely filed.  Accordingly,
the sufficiency of the evidence is the only issue properly before the Court in this appeal.

BACKGROUND

"Applying well-established principles of appellate review, we must consider the evidence and all reasonable inferences fairly deducible therefrom in the light most favorable to the Commonwealth, the prevailing party below." Walker v. Commonwealth, 272 Va. 511, 513, 636 S.E.2d 476, 477 (2006). "That principle requires us to discard the evidence of the accused in conflict with that of the Commonwealth and to regard as true all the credible evidence favorable to the Commonwealth and all fair inferences that may be drawn therefrom." Guda v. Commonwealth, 42 Va. App. 453, 455, 592 S.E.2d 748, 749 (2004).

Prior to the Commonwealth's case-in-chief, the following stipulation of evidence was read to the jury[2]:

> [Appellant] was born on April 27, 1943. [Wife] was born on December 19, 1970. [Older son] was born on January 2, 1993. [Younger son] was born on April 12, 1995. [Daughter] was born on April 18, 1996. [Appellant] and [wife] had custody of [older son], [younger son], and [daughter] until May 17, 2005. Prior to May 11, 2004, [older son] and [younger son] had anal sex, intercourse, with their cousin [] and their sister [daughter]. This occurred at [appellant's] residence in Culpeper County. Between May 11, 2004 and May 17, 2005, [older son] had anal sex, intercourse, with [daughter] numerous times, the most recent of which was on May 4, 2005, the day of [a particular school] awards ceremony . . . . These events occurred at [appellant's] residence in Culpeper County. [Younger son] saw these events but did not participate. As a result, the Juvenile and Domestic Relations Court entered the following orders: one, [older son], he was determined to be delinquent by a sufficient finding of evidence to find him guilty of two counts of sexual abuse by order entered on July 6, 2005; two, [younger son] was found to be abused and neglected by order entered on September 28, 2005; three, [daughter] was found to be abused and neglected by order entered on August 24, 2005. None of the children allege that [appellant] or [wife] were aware that these incidents took place at the time they happened. None of

---

[2] As we seek to protect the privacy of appellant's three children as much as possible, we will refer to appellant's sons herein as "older son" and "younger son" and to appellant's daughter as either "daughter" or "sister." Appellant's wife will be referred to as "wife."

the children allege that [appellant] or [wife] took part in these incidents . . . .

On May 7, 2004, after receiving a report involving appellant's children, Ann Calvert Chilton, a social worker for the Culpeper County Department of Social Services (DSS), interviewed older son, younger son, and daughter. Chilton learned during the interviews that both older son and younger son had been having sexual intercourse with their sister and a female cousin.

On May 11, 2004, Chilton met with wife. Chilton "let her know the allegations and what [Chilton] found out in her interview" with the children. When the prosecutor asked Chilton at trial, "Now when you say the allegations, did you tell [wife] all of the allegations," Chilton responded that she did. Wife returned to Chilton's office later that day with appellant. Chilton likewise confirmed that, in the second meeting with wife and appellant, she "explained to [appellant] the full extent of the allegations," as well, although Chilton said "[appellant] really didn't give [her] the time to explain like [she] would want to. [Appellant] said, 'I'm not hearing any[]more, I'm going to get my attorney, they'll be in contact with you.'" Appellant "pretty much said that they supervised their children, [and] he didn't need any services." Appellant, along with his wife, left Chilton's office.

Chilton made contemporaneous notes about the May 11, 2004 meeting in DSS's computer system. In those notes, admitted as Commonwealth's exhibit 1, Chilton wrote,

> [Appellant] kept stating it was not his boys that had sex with [cousin;] it was [cousin's teenaged half-]brother . . . . He stated they give [their] children supervision all the time. . . . [Appellant] stated he was not going to agree to counseling or anything because [his sons] were not guilty of having sex with [their] sister nor cousin.

Chilton sent appellant and wife a follow-up letter on May 19, 2004, reiterating DSS's determination that appellant's "family would benefit from further services" but that appellant had

"expressed that [they] do not want to participate in services at this time." Appellant's attorney never contacted Chilton.

Chilton referred the matter to Sergeant Lee Reese of the Culpeper Police Department. In the presence of Reese, appellant, and wife, both older son and younger son admitted to having sexual intercourse with their cousin. Shortly thereafter, on July 26, 2004, appellant and his wife received a letter from the office of Rob Miller, an Intake Officer with the Department of Juvenile Justice. The letter notified appellant and his wife that an intake appointment had "been scheduled by Investigator Rees [sic] with the police department regarding [older son] and a complaint of rape."

A psychological evaluation was ordered and performed on both sons by Dr. Jeffrey C. Fracher, a Virginia Licensed Clinical Psychologist. Dr. Fracher interviewed appellant, wife, and both sons and issued a written report for each son based on his findings. Fracher wrote that older son:

> has demonstrated inappropriate sexual behavior with both his younger sister and his younger cousin. His sexual behavior with younger children is viewed both as manifesting his problems with power and control and his sexually precocious and aggressive behavior. Though [older son] admitted a range of sexual activity with both his sister and his cousin, he did not accept responsibility for initiating any activity.

Fracher recommended that older son not have any unsupervised contact with young females. Moreover, Fracher concluded, "Both [appellant] and [wife] minimized the extent of [older son's] involvement in any inappropriate sexual activity." Likewise, Fracher reported that younger son:

> denies initiating any sexual activity with his cousin but did acknowledge sexual behavior, under pressure, with his younger sister. His sexual behavior with both his younger sister and his cousin is viewed as the result of pressure from others occurring in a sexually charged home environment.

Finally, Fracher, in younger son's report, recommended, "An assessment of younger sister's safety should be undertaken given the revelations in the current evaluations."

Following Dr. Fracher's assessments, Miller sent a letter to appellant and wife. The letter stated that Miller "would like to discuss the results of Dr. Frazier's [sic] evaluation and what this agency has to offer you and your family and whatever cares and concerns you may have." Miller met with wife and older son to discuss Fracher's report and services available for the family; appellant did not attend the meeting. Wife began to appear at Miller's office on a weekly basis, expressing concern about older son's use of tobacco, truancy problems, and running away from home. Appellant attended only one of those meetings with wife. According to Miller, at no time did either appellant or wife discuss their sons' sexual behavior or their daughter's safety.

On May 17, 2005, Jennifer Phillips, a child protective services (CPS) worker for DSS, removed daughter from appellant's household and initiated an investigation after receiving "a report that [sister's] siblings – brothers, [older son] and [younger son], were molesting her and that the parents had been informed of it prior." Phillips and a police investigator spoke with wife and learned that daughter had informed her in October 2004 "that [older son] had been bothering her sexually." Wife reported that, in response, she spoke to older son and "asked him how he had learned the behavior." Older son reported he had learned it from his teenaged male cousin.

Phillips, in her investigation narrative, reported that appellant and wife refused to give her access to older son, referring her instead to appellant's attorney. Phillips was able to interview younger son at his school on May 17, 2005. During the interview, younger son "claim[ed] that his parents were made aware of the situation by the [police department] and the other social worker. He stated that they were all told that they could not go around [sister] any more [sic]." Furthermore, younger son "stated that everytime he leaves the room his brother and sister go into his room and shut the door and tell everyone to stay out. [Younger son] stated that

he had never heard anything and that he felt that his father knew about it." Daughter reported to Phillips that "mom and dad tell her not to go into [older] brother's room" and that she and older brother "either had sex in [older brother's] bedroom or in [daughter's] bedroom" when "[appellant] was gone or downstairs."

Phillips took daughter to Diane Burkhart, a registered nurse and sexual assault nurse examiner (SANE). During a SANE examination on May 20, 2005, daughter informed Burkhart that older son "put his penis in [her] butt." Burkhart reported that the "rim of [daughter's] anal opening was very rounded from twelve to six and it was extremely flat and irregular and asymmetrical from six to twelve." Burkhart also found a chronic tear and concluded "that there has been some sort of force penetration to kind of make the sphincter loose so that it won't open or won't close all the way." Consequently, "[daughter's] lost some sphincter control and she can't control her bowel movements." Burkhart said when she questioned daughter about her bowels, daughter reported, "Sometimes it just comes out and surprises me, [stool] and I have to change my underwear."

After Phillips removed daughter from appellant's household on May 17, 2005, daughter went to live with foster mother Amanda Tibbs. Tibbs explained that when daughter first came to Tibbs' home, daughter had an odor problem and that "after we did more examining of it, we found out that she was having soiling leakage where she had feces leaking from her rectum." Tibbs said daughter tried to clean herself, "but she really couldn't." Daughter "was taking her underwear out and balling them up and changing them but there was feces everywhere." Tibbs taught daughter "how to clean her rectum area," but because daughter continued to "have little leakage of brown liquid-type stuff[,] . . . we started using pads and panty liners in the rear of her clothing so it wouldn't go through while she was at school, having accidents." Tibbs also recalled that daughter suffered from nightmares.

Appellant testified and admitted learning from Ann Calvert Chilton in May 2004 that his sons had sexual intercourse with their cousin. Despite this revelation, appellant claimed he "didn't know that [his sons] needed [counseling] because [he] didn't know what was wrong." He also denied rejecting Chilton's offer of counseling for the children, saying he left her office hurriedly because he did not want to be late for work. He said he called DSS several times after the meeting with Chilton but claimed no one ever returned his calls. Appellant denied that Chilton said anything to him during the May 11, 2004 meeting about his daughter, and he claimed he did not know his sons were having sexual intercourse with their sister until DSS removed her from his household on May 17, 2005. Appellant explained that both he and his wife laundered their daughter's clothes, and when asked whether he "noticed back in May of 2005 that [daughter] had been soiling her pants," appellant responded, "No, sir, she definitely hadn't." Appellant insisted "[they] never had no sign of anything" indicating that daughter "couldn't hold her bowels."

Wife, like appellant, denied that Chilton had told them their sons were having intercourse with daughter, claiming Chilton reported only that her sons had had intercourse with their cousin. However, wife also indicated that, "back after [they] talked with Calvert Chilton," wife "asked [older son] about his involvement with [daughter]," but he would not answer her. Wife also testified that, at some point before daughter was removed from the house on May 17, 2005, wife and appellant no longer allowed daughter to play upstairs with older and younger son without supervision, that "[s]omeone was up and back and forth checking on them."

A jury found appellant guilty on one count of cruelty and injury to children and three counts of contributing to the delinquency of a minor. Appellant was sentenced to fourteen months imprisonment and fined $3,000. An appeal to this Court followed.

ANALYSIS

Generally speaking, "When a case, civil or criminal, is tried by a jury . . . the judgment of the trial court shall not be set aside unless it appears from the evidence that such judgment is plainly wrong or without evidence to support it." Code § 8.01-680. When considering the sufficiency of the evidence on appeal, "a reviewing court does not 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" Crowder v. Commonwealth, 41 Va. App. 658, 663, 588 S.E.2d 384, 387 (2003) (quoting Jackson v. Virginia, 443 U.S. 307, 318-19 (1979)). Instead, "'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Kelly v. Commonwealth, 41 Va. App. 250, 257, 584 S.E.2d 444, 447 (2003) (*en banc)* (quoting Jackson, 443 U.S. at 319).

A. THE INJURY AND CRUELTY TO CHILDREN CHARGE

Code § 40.1-103(A) provides:

> It shall be unlawful for any person employing or having the custody of any child willfully or negligently to cause or permit the life of such child to be endangered or the health of such child to be injured, or willfully or negligently to cause or permit such child to be placed in a situation that its life, health or morals may be endangered, or to cause or permit such child to be overworked, tortured, tormented, mutilated, beaten or cruelly treated. Any person violating this section shall be guilty of a Class 6 felony.

As we held in Mosby v. Commonwealth, 23 Va. App. 53, 473 S.E.2d 732 (1996), "'The negligence required in a criminal proceeding must be more than the lack of ordinary care and precaution. It must be something more than mere inadvertence or misadventure. It is a recklessness or indifference incompatible with a proper regard for human life.'" Id. at 59, 473 S.E.2d at 735 (quoting Bell v. Commonwealth, 170 Va. 597, 611, 195 S.E. 675, 681 (1938)). "The negligence must be 'so gross and culpable as to indicate a callous disregard of human life

- 8 -

and of the probable consequences of his act.'"  Id. (quoting Keech v. Commonwealth, 9 Va. App. 272, 277, 386 S.E.2d 813, 815 (1989)).

This Court further articulated the *mens rea* required to sustain a conviction under Code § 40.1-103 in Ellis v. Commonwealth, 29 Va. App. 548, 513 S.E.2d 453 (1999).  There, we held,

> While willful misconduct requires an intentional or purposeful act or failure to act, gross or criminal negligence involves a failure to act under circumstances that indicate a passive and indifferent attitude toward the welfare of others.  Moreover, the defendant must be proved indifferent in the face of knowledge that injury or illegality will be the probable result or, in the alternative, that circumstances exist under which the defendant may be chargeable with such knowledge.

Id. at 557, 513 S.E.2d at 458 (citation omitted).

Here, appellant learned of his sons' sexual contact with their cousin during his meeting with social worker Ann Calvert Chilton in May 2004 but later claimed he "didn't know what was wrong" and, consequently, didn't realize that his sons needed counseling or services.  In addition, Chilton testified that, during that meeting, she informed both wife and appellant of "the full extent of the allegations," although appellant told Chilton he did not want to hear any more and "really didn't give [Chilton] the time to explain like [she] would want to."  Chilton made contemporaneous notes of the meeting, which stated appellant denied his sons were "guilty of having sex with *[their] sister* []or cousin" (emphasis added), thereby confirming that Chilton spoke to appellant specifically about his sons' admissions to having sex with their sister, appellant's daughter.  Although appellant and wife both claimed at trial that Chilton spoke only of the sons' assault on cousin and did not mention daughter, wife admitted on cross-examination that "back after" they met with Chilton, wife "went and asked [older son] about his involvement with [daughter]."  In addition, younger brother informed CPS worker Phillips that "his parents were made aware of the situation by the [police department] and the other social worker" and that, afterward, he and older brother were "told they could not go around [daughter] any more."

Daughter reported that "mom and dad [told] her not to go into [older brother's] room." Chilton's testimony and contemporaneous computer notes, coupled with wife's admission and the children's statements to Phillips, support a finding that, at the May 2004 meeting, Chilton told both wife and appellant about their sons' sexual assaults on their daughter as well as on their cousin.

Further, the evidence supports a finding that appellant responded to the allegations of sexual assault by denying Chilton's offer of counseling for his children and telling Chilton she would be hearing from his attorney, which Chilton said she never actually did. Appellant, thereafter, failed to confront the circumstances present in what Dr. Fracher termed "a sexually charged home environment," which resulted in his older son's continuing sexual assaults on his daughter until her removal from appellant's household by CPS a little over a year after appellant was first informed of the assaults. Dr. Fracher's reports indicated appellant's attitude and demeanor during their meeting led Dr. Fracher to conclude that appellant "minimized the extent of [older son's] involvement in any inappropriate sexual activity."

Perhaps most telling, however, is the medical evidence concerning daughter's physical condition. SANE nurse Burkhart, during her May 20, 2005 examination, found that daughter had suffered a chronic tear in her anal opening and, moreover, that force penetration had rendered "the sphincter loose so that it won't open or won't close all the way." As daughter's foster mother Amanda Tibbs explained, when daughter came to live with Tibbs following her May 17, 2005 removal from appellant's home, daughter "was having soiling leakage where she had feces leaking from her rectum." The evidence supported a finding that this resulted from the trauma daughter sustained through anal intercourse with her oldest brother in appellant's house. In short, daughter was unable to control her bowel movements as a result of the continuing sexual assaults. Daughter was unable to clean herself properly and, although she would change

her underwear after she soiled herself, Tibbs reported "there was feces everywhere." The evidence established that the final sexual assault occurred on May 4, 2005, and that daughter continued to reside with appellant and wife until her removal on May 17, 2005. The fact finder, therefore, appropriately rejected appellant's claim that he did not notice daughter's soiling problem while doing her laundry and that daughter "definitely hadn't" been soiling herself in May of 2005 before she was removed from appellant's home. See Marable v. Commonwealth, 27 Va. App. 505, 509-10, 500 S.E.2d 233, 236 (1998) ("In its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt.").

In sum, we hold that a rational fact finder, in this case the jury, could quite reasonably conclude that appellant "proved indifferent in the face of knowledge that injury or illegality will be the probable result" of his failure to act. Ellis, 29 Va. App. at 557, 513 S.E.2d at 458. For over one year, appellant failed to take the necessary steps to prevent his daughter, who was between eight and nine years old at the time, from sustaining injury resulting from sexual intercourse with her older brothers. Moreover, during this same time period, appellant failed to get his sons the appropriate counseling and services necessary to prevent the further illegal sexual assaults on his daughter. The evidence, viewed on appeal in the light most favorable to the Commonwealth, demonstrates that appellant's actions, and more importantly his omissions, were undertaken with a callous disregard for the welfare of his own children, most notably his own daughter. Accordingly, the evidence is sufficient to sustain a conviction under Code § 40.1-103.

B. THE CONTRIBUTING TO THE DELINQUENCY OF A MINOR CHARGES

Code § 18.2-371 provides in relevant part:

> Any person 18 years of age or older, including the parent of any
> child, who (i) willfully contributes to, encourages, or causes any

act, omission, or condition which renders a child delinquent, in need of services, in need of supervision, or abused or neglected as defined in § 16.1-228 . . . shall be guilty of a Class 1 misdemeanor.

Here, the parties stipulated that the Culpeper Juvenile and Domestic Relations District Court found appellant's older son delinquent and appellant's younger son and daughter abused and neglected. As detailed above, appellant's indifference in the face of overwhelming evidence of inappropriate and illegal sexual contact between his children led directly to the older son being found delinquent and the younger son and the daughter being found abused and neglected. The evidence, consequently, is sufficient to sustain appellant's convictions on three counts of contributing to the delinquency of a minor.

CONCLUSION

For the foregoing reasons, we affirm appellant's convictions.

<u>Affirmed.</u>

Benton, J., dissenting.

The evidence in this case was insufficient to prove appellant was criminally negligent in relation to the acts perpetrated upon his daughter. The evidence also failed to prove appellant contributed to the delinquency of his children. The evidence in the record is consistent with appellant's testimony that his understanding of the social worker's concern in 2004 was the cousin "had reported [the two boys] had had sex with [the cousin]," that the social worker "didn't give [him and his wife] enough information to clarify what she was talking about," and that neither he nor his wife willfully or negligently endangered their children.

> [A] criminal statute . . . requires proof of a greater degree of negligence than is required in a civil action. "The negligence required in a criminal proceeding must be more than the lack of ordinary care and precaution. It must be something more than mere inadvertence or misadventure. It is a recklessness or indifference incompatible with a proper regard for human life." Bell v. Commonwealth, 170 Va. 597, 611, 195 S.E. 675, 681 (1938). The negligence must be "so gross and culpable as to indicate a callous disregard of human life and of the probable consequences of his act." Keech v. Commonwealth, 9 Va. App. 272, 277, 386 S.E.2d 813, 815 (1989) (quoting Goodman v. Commonwealth, 153 Va. 943, 952, 151 S.E. 168, 171 (1930)).

Mosby v. Commonwealth, 23 Va. App. 53, 59, 473 S.E.2d 732, 735 (1996) (citations omitted).

This family came to the attention of the local department of social services in May of 2004 because of a complaint that one of the sons was having sexual relations with his cousin. The evidence proved that appellant's children, who were ages 11, 9, and 8 at the time of these events, were threatened and influenced by the teenage brother of their cousin to engage in sexual activities. Neither appellant nor his wife was aware of those events prior to May of 2004.

When a social worker conducted "a protective services assessment" concerning the sons' activities with the cousin, appellant's daughter informed the social worker she also had been sexually active with her older brother but not the younger brother. The daughter and the sons

- 13 -

said appellant and his wife did not know of the activity and "would be so upset . . . if they knew." Several days later, when the social worker met with appellant's wife and informed her of the complaint and interviews with the children, appellant's wife was "shocked." Later that day, when both parents met with the social worker, appellant expressed disbelief and said he and his wife supervised their children. Appellant said he believed the cousin's older teenage brother was the one having "sex" with the cousin. The social worker testified she did not fully inform appellant of the circumstances because appellant was agitated and "really didn't give [her] the time to explain like [she] would want to." The social worker concluded, however, that appellant and his wife "would handle it like any other parents would" and that they "were going to look into the situation and call . . . for services."

The social worker's assessment report discloses that appellant "kept stating it was not his boys having sex with [the cousin] it was her brother" and that appellant's wife also said the cousin's "brother . . . is the one having sex with the [cousin] not her children." It indicates both parents said they supervised their children. The report concluded "children are safe," indicated the parents "need to supervise [the children] more closely when there is mixed company," and noted "cousin does not come around the house anymore." The report contains no recommendation specific to the daughter.

The social worker did not meet with the family again. Instead, she sent a letter in May 2004 that informed appellant and his wife, in part, as follows:

> In response to the recent allegations called into our agency, Child Protective Services has completed a Family Needs Assessment with your family. After assessing the situation, it was determined that your family would benefit from further services.
>
> You have expressed that you do not want to participate in services at this time. Therefore, we will be closing your file. Thank you for your cooperation in completing this assessment.

Although the social worker testified that she turned the matter over to the police, she obviously did not deem to be significant the daughter's disclosure of some type of sexual activity with her brother because she failed to inform the police of any report by the daughter or of any sexual activity involving the daughter.

Police Officer Reese, who received the report from the social worker, testified that the report only concerned the boys' sexual activity with a cousin who lived in another county. He also testified that the report contained no mention of the boys' involvement with their sister and that during his investigation from May to July of 2004 he received no report indicating appellant's daughter was involved in any sexual activity. Officer Reese testified that appellant and his wife cooperated in his investigation and that appellant "instructed [the children] to be honest with [the officer]" when he interviewed them.

An intake officer working for the Department of Juvenile Justice testified that Officer Reese informed him of the investigation and that he then sent a letter to appellant and his wife informing them their older son was being investigated for "a complaint of rape" involving his cousin. He testified that the investigation concerned only the son's cousin as a victim and that the daughter was never "mentioned as a victim." Indeed, when he talked to the appellant and his wife about the son's sexual conduct, he explained to them that the victim of these events was reported to be the son's cousin. During the intake process, he prepared two diversion plans: both plans provided the sons "will not have contact with [the cousin]." The intake officer gave the following narrative of the information disclosed to appellant and his wife in the intake conference on August 16, 2004:

> [The older son] was brought to intake by his mother and father
> . . . . Officer Reese was present to discuss the accusations bringing
> the family to this point. [The son] along with his brother were
> accused of having sex with their 7 year old cousin . . . who lives in
> [another] county. [The cousin] and her family were not present for
> the intake hearing. [The son] explained that [the cousin]

- 15 -

confronted him. [The son] admits to having sex with her and knows that it is wrong. The family seems to be very limited mentally. Diversion with [the son] and brother having no contact with [the cousin] and cooperating with a sexual evaluation and therapy [is] recommended. . . .

The intake officer testified appellant and his wife wanted to obtain help for their sons. He testified, however, that he "did . . . question the [parents'] ability . . . to understand the process because it is a very difficult process and . . . [the process] relied upon them to trust that [they] were going to get services and help for [both sons]." Although the intake officer attempted "to get services and help for [both sons]," he was unsuccessful when he sought assistance from the social services agencies. He testified the family preservation services did not get involved because of a "budget crunch." Finding no assistance from the agencies, the intake officer referred the family to Dr. Fracher for a psychosexual evaluation on October 6, 2004.

Appellant and his wife took their sons to Dr. Fracher for the psychosexual evaluations. The reports of the evaluations, dated October 11, 2004, indicate each son was "accused of sexual activity with his . . . cousin." The reports also indicate the cousin's older teenage brother was involved in the activity and made threats to each of the sons. The older son told Dr. Fracher "he did not try to have sex with his [sister] despite threats from [the cousin's teenage brother]"; however, he acknowledged that his cousin's teenage brother made his sister perform a sexual act on him. The younger son "did admit to 'having sex' with his younger sister" after he had been threatened by the cousin's older teenage brother, but, "when asked about the extent of his sexual activity with his sister, [he] indicated that he kissed her." The reports recommend that "an investigation into [the] older male half-cousin's involvement in the sexual activity . . . should be undertaken" and that "an assessment of [the] . . . sister's safety should be undertaken."

The intake officer testified that Dr. Fracher did not give appellant and his wife a copy of the evaluation report and that social services did not undertake to do the assessment which was

- 16 -

recommended by Dr. Fracher.  When the social services agency did not follow through "because of money" and did not offer the family any help, the intake officer discussed the evaluation report with appellant's wife but "didn't go over it word-by-word or even the recommendations." The intake officer testified he saw appellant's wife "probably once a week . . . she was always coming asking . . . for help . . . she would oftentimes wait until the end of the day when I didn't have appointments."  He described the parents as cooperative throughout the process, and he also testified "the family was looking for help [he] could not provide and did not have the power to provide it."  He further testified that appellant and his wife were concerned that the older son was not listening to them and was rebelling.  The intake officer explained, however, that the daughter "was never an issue" and that he "never talked [to appellant and his wife] about [the daughter]."

Similarly, a juvenile court probation officer testified that when she received the referral from the intake officer, the daughter was not identified as a victim of sexual assaults.

> Q:  Okay.  Now were you aware that the two . . . boys had been involved in some sexual activities during this period of time?
>
> A:  Yes, I was.
>
> Q:  What was your indication who the victim was in the case?
>
> A:  When I got the case, I was told to take it to FAPT [Family Assessment and Planning Team] because of inappropriate sexual behavior between the boys and a cousin, a cousin from . . . [another] County.
>
>           *       *       *       *       *       *       *
>
> Q:  Was there any mention of the sister. . . .
>
> A:  No.

She further testified she talked to Dr. Fracher, who prepared the evaluation report, and "asked him had he reviewed the evaluation with the parents."

> Q:  What did he say?
>
> A:  He said no.

- 17 -

Q: Did he say he had sent it, mailed it to them?

A: I asked him did he mail them a copy, and he said no, and I asked him did he talk with them after he did the evaluation about any information that came out in the evaluation, and he said no, and I expressed concern about that.

Q: Now, in meeting with [appellant and his wife], did you ever get any indication that they were aware of the contents of that report?

A: I asked [appellant]. He said no.

Q: He said he didn't know of it. Did you tell him about it?

     *  *  *  *  *  *  *

A: Oh, no, no.

Q: And how come?

A: Because in my training if you're not a psychologist you cannot interpret any type of psychological evaluations, so when I called Dr. Fracher, I asked him who could interpret it if I couldn't, and he explained that the family could have it sent to their pediatrician, . . . and they could explain it to them, but he didn't feel it would be a problem doing that.

The probation officer also described the following events that occurred at a FAPT

meeting in May 2005, several days before the daughter was removed from the home:

Q: All right. Was this report that Dr. Fracher had done ever brought up at this meeting?

A: I brought it up, yes.

Q: Okay. Did you bring it up that [the daughter] ---the report indicated that [the daughter] had been involved?

A: I did. Before [appellant] came in the room, we reviewed the case and I explained to them that I was extremely concerned because the concentration had been on [the cousin] and because [the cousin] was not in the house, I felt like that, you know, maybe somebody didn't ---they didn't realize that there was actually some things that had happened to [the daughter] and I expressed concern that the psychologist never reviewed it with them, and I didn't know if the parents even knew that the boys disclosed that.

Q: Now, again, was there a representative from the Department of Social Services there?

- 18 -

A: Yes.

Q: Did they indicate they knew anything about this report?

A: I asked them if they had gotten any---

Q: Or this case.

A: I asked them if they had worked with it at all and gotten any reports, and she said she was not aware of that but she would go back and investigate.

Q: Did you ever hear from her?

A: No.

Q: Now, was the fact that [the daughter] had been a victim in this case ever brought up in front of [appellant].

A: No, not at that FAPT meeting.

Q: Was it ever brought up in front of them that you're aware of?

A: Not that I'm aware of. They questioned [appellant] about what he was doing to keep [the daughter] safe and he explained that [the cousin] was the victim, and she's not in the home so he keeps [the cousin] and the boys separate, but he didn't---he did not know of anything happening with [the daughter].

Q: So none of the professionals in that meeting said, [appellant], are you aware that [the daughter] has been assaulted by your boys? Nobody said that to him.

A: No.

Several days after this conference, which was seven months after Dr. Fracher's evaluation report was prepared, social services removed the daughter from the home. Social services acted because the daughter reported at this time that she "had sex" with the older son two times "around Christmas" but never with the younger son. She told the social worker, however, that appellant and his wife had instructed her not to go into the older son's room and that she never told the parents about these events. The social worker testified that when she interviewed appellant's wife, appellant's wife said she had a talk with her daughter in October

- 19 -

2004 about the reported events. The social worker explained her notes of the interview with

appellant's wife as follows:

> Q: The ones about her statement. She says she knew it in October. Is that what it says?
>
> A: I found out in October.
>
> Q: He threatened [both sons] to have sex with [the daughter].
>
> A: [The cousin's teenage brother] to have sex with [the daughter].
>
> Q: Okay, so it was about [the cousin's teenage brother], that's what your notes reflect.
>
> A: My notes reflect that she was reminded or told in October by [the daughter]. I didn't read all of the notes. I asked ---I mean, I---
>
> *     *     *     *     *     *     *
>
> Q: I mean, she was talking about [the cousin's teenage brother].
>
> A: What my note says, [the daughter] came and told [appellant's wife] that [the cousin's teenage brother] tried to have sex with her. [Appellant's wife] knew about it in October. She was --- [appellant's wife] was told later that it happened before. [Appellant's wife] found out in October about [her son]. He threatened --- he, being [the cousin's teenage brother], that I have in quotations, threatened [both sons] to have sex with [the daughter].

Simply put, none of the evidence in this case established the appellant or his wife

"willfully contribute[d] to, encourage[d], or cause[d] any act, omission, or condition which

renders a child delinquent, in need of services, in need of supervision, or abused or neglected as

defined in § 16.1-228," Code § 18.2-371, or "willfully or negligently . . . cause[d] or permit[ted]

the life of such child to be endangered or the health of such child to be injured, or willfully or

negligently cause[d] or permit[ted] such child to be placed in a situation that its life, health or

morals may be endangered," Code § 40.1-103. As we held in Ellis v. Commonwealth, 29

Va. App. 548, 554, 513 S.E.2d 453, 456 (1999), willful conduct generally "denotes "'an act

which is intentional, or knowing, or voluntary, as distinguished from accidental.'"" Thus, even

if the evidence proves misguided conduct or bad judgment, it only "is reflective of simple negligence, not criminal conduct." Id. at 556, 513 S.E.2d at 457.

The record indicates the thrust of the information relayed to appellant and his wife beginning in May 2004 concerned sexual activity between the son and the cousin. When they learned of the incidents, they took steps to bar the son from being in the presence of the cousin and barred the cousin's teenage brother from their house. The evidence proved that the parents talked to the daughter after hearing of the sexual activity involving the older son and his cousin, forbade the daughter to enter the son's room, kept the son away from the cousin, sought help in dealing with the son, and believed that the cousin's teenage brother had been the perpetrator of the acts against his cousin and their daughter. Furthermore, no evidence proved appellant or his wife knew the daughter had hygiene problems associated with the sexual activity. Indeed, testimony in the record indicated they were loving and caring parents to their children and they believed the real issue related to the influence of the teenage boy and their son's activities with his cousin. When they sought help for the son from social services, they were neglected.

The intake officer's testimony sadly but accurately describes what happened with this family, who had limited resources and limited "ability . . . to understand . . . the process."

> Q: Did the Department of Social Services step in and offer any help?
>
> A: Not that I'm aware of.
>
> Q: Is it fair to say that this family fell through the cracks?
>
> A: Yes, yes, it did.
>
> Q: And it's also fair to say that the agencies that are supposed to provide services and protect children could have done a lot better job with this family.
>
> A: Yes, and, you know, even I had questioned my own agency that I work for and for the whole system, itself, how much better it could have responded to this whole situation. I think that there's just a real lack of communication between offices, you know?

- 21 -

　　　　*　　　*　　　*　　　*　　　*　　　*　　　*

　　Q:  You said the parents were cooperative.

　　A:  Yes, sir.

For all these reasons, I would reverse the convictions and dismiss the indictments.