COURT OF APPEALS OF VIRGINIA

Present:   Judges Frank, Humphreys and Huff
Argued by teleconference


TROY J. DAVIS

MEMORANDUM OPINION[*] BY
v.        Record No. 2036-11-2            JUDGE ROBERT J. HUMPHREYS
                                          OCTOBER 31, 2012

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
Harold W. Burgess, Jr., Judge

Stephen K. Armstrong (Armstrong Law LLC, on brief), for
appellant.

Leah A. Darron, Senior Assistant Attorney General (Kenneth T.
Cuccinelli, II, Attorney General, on brief), for appellee.


Troy J. Davis ("Davis") was convicted at a bench trial of felony child neglect, in

violation of Code § 18.2-371.1(B).  On appeal, Davis contends that the trial court erred in finding

the evidence sufficient to support his conviction.  For the following reasons, we reverse the

judgment of the trial court.

I.  BACKGROUND

On appeal, we consider the evidence in the light most favorable to the Commonwealth,

the prevailing party at trial.  Williams v. Commonwealth, 49 Va. App. 439, 442, 642 S.E.2d 295,

296 (2007) (*en banc*).  This Court must "discard the evidence of the accused in conflict with that

of the Commonwealth, and regard as true all the credible evidence favorable to the

Commonwealth and all fair inferences to be drawn therefrom."  Parks v. Commonwealth, 221

Va. 492, 498, 270 S.E.2d 755, 759 (1980).  In this light, the evidence established the following.

  [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

On the morning of August 20, 2009, Davis woke up to feed his three-month-old twin sons, T.D. and C.D., as Candice Tyler ("Tyler"), the twins' mother, left for work.[1] While feeding the children in his bed, Davis noticed formula coming out of T.D.'s nose and mouth. Davis had not seen T.D. spit up through his nose before. At 7:56 a.m. Davis sent a text message to Tyler indicating that something serious was wrong with T.D. Over the next hour and twenty-one minutes, Davis called Tyler and his mother, both regular caregivers to T.D., seeking help.[2] When Davis noticed T.D. spitting up more than normal, Davis picked him up, tried to get stuff out of his mouth, patted him, and turned him over to "drain out his system." Davis removed T.D.'s onesie because it was soaked, and cleaned up T.D. after he defecated. T.D. made breathing noises, his eyes looked normal, stuff was coming out of his mouth, and he was burping. T.D. had another extreme bowel movement. Davis then got in the tub with T.D. and washed T.D.'s whole body. After they got out of the bath tub, T.D. was "out of it" and more unresponsive, and spit up a brown or bloody liquid. T.D. defecated one last time, burped, and collapsed. At some point, Davis performed cardiopulmonary resuscitation ("CPR") on T.D. for fifteen to twenty minutes. Davis reported that he was nervous and shaking and did not know what to do, but he did what he learned in CPR class. T.D. spit up more after the compressions. Davis' mother arrived and told Davis to call the police; he called 911 at 9:17 a.m. Paramedics transported T.D. to the hospital, where T.D. was pronounced dead.

---

[1] The trial court accepted Davis' uncontradicted statements to the police, and did not express any doubt as to Davis' credibility in making those statements. In announcing its verdict, the trial court stated that in making its decision, "I look at a number of things. First, I looked at [Davis'] statements [to the police]." Detective Lucy Yonce interviewed Davis twice, and both interviews were recorded and entered into evidence at trial. Davis did not testify at trial.

[2] Davis spoke to Tyler on the phone three times and received one voicemail message from her; he spoke to his mother on the phone three times and received two voicemail messages from her. He also made one call to 411 at 8:05 a.m. Between 8:19 a.m. and 8:46 a.m., Davis did not make or receive any calls.

At the hospital, Davis told Detective Yonce that T.D. was not unresponsive right away and that he thought he could save T.D. on his own. He said, "[the] only thing I could think of was to do CPR." When T.D. spit up more after the compressions, Davis thought it was good that fluids were coming up. Davis saw a "whole lot of fluids coming out" and "T.D. was pooping still," so he thought this was a good sign and that T.D. possibly had gas. When T.D. was defecating, Davis recalled, "I'm thinking alright he's pooping, everything's cool, alright." He stated, "I'm trying to figure out what's wrong with [T.D]."

> I'm just trying to figure out this situation because it's a situation I don't know what to do in. The first thing I should have did was call the ambulance, but I didn't think it was necessary because I thought it was because of how I was feeding him that stuff started coming up.

In a second interview by Detective Yonce, four days after T.D.'s death, Davis stated, "I shouldn't have panicked the way I did. . . . I think I could have did things better like call the police. I just didn't think it was a police situation because its normal for a baby to be doing that [spitting up]." Davis added that initially T.D.'s eyes looked normal, he was making breathing noises and bowel movements, stuff was coming out of his mouth, and he was burping, so that's why "I thought there was something still I could do." When he pushed on T.D.'s stomach and stuff was still coming up, he said "I'm thinking I'm doing something." He said he was trying to do whatever he could within his ability to help. "If I knew it was that serious, what was going on, I would have [ ] called 911." Davis added that he called the police as soon as his mother arrived and told him to.

The trial court stated its findings as follows:

> First, I looked at Mr. Davis' statements. First, the evidence I have from him in statements given to the police was, the baby was coughing up stuff; brown like blood, and he was incisively pooping, as he put it.

He then sends a text at 7:56 a.m. to the child's mother saying, this is serious. He then, after, makes repeated statements to the police that he did not know what to do. He had taken some CPR classes, but the Court infers he was sort of at his wit's end, not knowing exactly what to do.

He also told the police he [had] never seen this child spit up like this before. That he had seen him spit up before, but this was different. Later in his statement to the police he says he should have called an ambulance.

The Court believes that Mr. Davis was on notice [that] the child was in severe distress and that his willful omission and not calling 911 created a situation placing the child at risk of actual physical harm.

Also looked [sic] more closely at the time line. I noticed that after that initial text and the flurry of calls to and from Mr. Davis, both from his mother and then the natural mother, there is a 27-minute gap, specifically between 8:19 a.m. and 8:46 a.m. where there were no calls, before he called the mother once again.

The phone activity itself is, I think, supports an inference by the Court that Mr. Davis was on notice that this is a desperate situation, [and] that he needed to take extraordinary measures to protect the child.

Based on these findings, the trial court convicted Davis of felony child neglect. This appeal followed.

## II. ANALYSIS

On appeal, Davis argues that "the trial court erred by deciding that [Davis] committed a willful act or omission in the care of a child that was so gross, wanton and culpable as to show a reckless disregard for human life."

"[W]hen the sufficiency of the evidence is attacked on appeal, the judgment of a trial court sitting without a jury is entitled to the same weight as a jury verdict." Coles v. Commonwealth, 270 Va. 585, 587, 621 S.E.2d 109, 110 (2005). This Court presumes "the judgment of the trial court to be correct, and will not set it aside unless it is plainly wrong or without evidence to support it." Davis v. Commonwealth, 39 Va. App. 96, 99, 570 S.E.2d 875,

876-77 (2002) (internal quotations and citations omitted). "'[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Kelly v. Commonwealth, 41 Va. App. 250, 257, 584 S.E.2d 444, 447 (2003) (*en banc*) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).

Code § 18.2-371.1(B)(1) provides:

> Any parent, guardian, or other person responsible for the care of a child under the age of 18 whose willful act or omission in the care of such child was so gross, wanton and culpable as to show a reckless disregard for human life shall be guilty of a Class 6 felony.

The "gross, wanton and culpable as to show a reckless disregard for human life" conduct required for a conviction under Code § 18.2-371.1(B) equates to criminal negligence. Ferguson v. Commonwealth, 51 Va. App. 427, 438, 658 S.E.2d 692, 697 (2008) (*en banc*).

> "Criminal negligence . . . is judged under an objective standard and, therefore, may be found to exist where the offender either knew or should have known the probable results of his acts. Thus, criminal negligence is acting consciously in disregard of another person's rights or acting with reckless indifference to the consequences, with the defendant aware, from his knowledge of existing circumstances and conditions, that his *conduct probably* would cause injury to another."

Id. (emphasis in original) (quoting Kelly v. Commonwealth, 42 Va. App. 347, 356, 592 S.E.2d 353, 357 (2004)). A criminal statute "requires proof of a greater degree of negligence than is required in a civil action." Mosby v. Commonwealth, 23 Va. App. 53, 59, 473 S.E.2d 732, 735 (1996). "'The negligence required in a criminal proceeding must be more than the lack of ordinary care and precaution. It must be something more than mere inadvertence or misadventure. It is a recklessness or indifference incompatible with a proper regard for human life.'" Id. (quoting Bell v. Commonwealth, 170 Va. 597, 611, 195 S.E. 675, 681 (1938)). "The negligence must be 'so gross and culpable as to indicate a *callous disregard of human life* and

- 5 -

the probable consequences of his act.'" Id. (emphasis added) (quoting Keech v. Commonwealth, 9 Va. App. 272, 277, 386 S.E.2d 813, 815 (1989)).

This Court addressed the severity of the nature of the negligent conduct necessary to constitute gross and wanton negligence in Tubman v. Commonwealth, 3 Va. App. 267, 274, 348 S.E.2d 871, 875 (1986) (emphasis added) (quoting Town of Big Stone Gap v. Johnson, 184 Va. 375, 378-79, 35 S.E.2d 71, 73 (1945)):

> "Gross negligence is substantially and appreciably higher in magnitude than ordinary negligence . . . [i]t is very great negligence, or *the absence of slight diligence*, or *the want of even scant care*. . . [i]t is a heedless and palpable violation of legal duty respecting the rights of others. . . . Wanton negligence is of even a higher degree than gross negligence. Webster's New International Dictionary, 2d ed., defines wanton as marked by or manifesting arrogant recklessness of justice, of the rights or feelings of others . . .; *merciless*; *inhumane*."

Further, "'gross negligence is that degree of negligence which shows an utter disregard of prudence amounting to complete neglect of the safety of another.'" Big Stone Gap, 184 Va. at 379, 35 S.E.2d at 73 (quoting Wright v. Osborne, 175 Va. 442, 445, 9 S.E.2d 452, 454 (1940)).

In the light most favorable to the Commonwealth as the party that prevailed below, the trial court in this case found "that Mr. Davis was on notice [that] the child was in severe distress and that his willful omission and not calling 911 created a situation placing the child at risk of actual physical harm." The court then found beyond a reasonable doubt that Davis' "omission was so gross, wanton, [and] culpable to show a reckless disregard for human life." Thus, the trial court essentially found as a matter of law that Davis' failure to call for emergency assistance sooner than he did in this situation was enough standing alone to constitute "gross negligence as to show a reckless disregard for human life." We hold that this was error.

It is uncontroverted that Davis made attempts to care for his child once he realized the child was in distress: upon noticing excessive and unusual spit-up from T.D., Davis picked him

up and patted him, tried to get stuff out of his mouth, twice cleaned up T.D.'s bowel movements, washed T.D. in the bathtub, called T.D.'s regular caregivers for advice, administered CPR for fifteen to twenty minutes, and ultimately did call 911 after his mother advised him to do so.

This case is easily distinguished from Flowers v. Commonwealth, 49 Va. App. 241, 250, 639 S.E.2d 313, 317-18 (2007), where this Court affirmed Flowers' conviction of reckless endangerment of children in violation of Code § 18.2-371.1(B)(1). Flowers failed to secure prompt medical attention for juveniles in her care despite the fact that she believed that they had taken some type of drug and needed immediate medical attention. Id. at 248-49, 639 S.E.2d at 317. Significantly, she waited three hours before calling the father of one of the children; she never called 911 or otherwise sought medical attention; and she asked the child's father not to call either the child's mother, who lived nearby, or the police. Id. at 249, 639 S.E.2d at 317.

In the present case, although Davis' efforts fell short and were ultimately insufficient to save the life of the child, even in the light most favorable to the Commonwealth, the record reflects that at no time did Davis simply disregard the care and needs of the child as was the case in Flowers. Davis actively engaged in rendering aid to T.D. He gave unchallenged and unrebutted reasons why he thought his actions were helping T.D. and stated that he did not know how serious the situation was. Davis' attempts to care for T.D. are uncontested, and they certainly do not evidence an absence of "slight diligence," the want of even "scant care," Tubman, 3 Va. App. at 274, 348 S.E.2d at 875, the "callous disregard for human life," Mosby, 23 Va. App. at 59, 473 S.E.2d at 735, or the "complete neglect for the safety of another," Big Stone Gap, 184 Va. at 379, 35 S.E.2d at 73, as required for gross negligence.

The trial court's interpretation of the criminal negligence standard in this case equates to a bright line rule that in spite of any other actions by a child's caregiver, the failure of a caregiver to promptly call 911 upon observing signs of distress in a child constitutes felonious conduct so

gross, wanton, and culpable as to show a reckless disregard for human life. While Davis certainly could have, and with the benefit of hindsight certainly should have, called 911 to seek emergency medical assistance sooner than he did, given the lack of any other evidence indicating conduct showing a callous or reckless disregard for the life of the child and the uncontradicted evidence of the actions that Davis did take to deal with his child's distress, the evidence in this record in the light most favorable to the Commonwealth cannot support a finding of more than ordinary negligence. Therefore, we hold that the evidence is insufficient as a matter of law to constitute conduct so gross, wanton, and culpable as to indicate a callous disregard of human life in violation of Code § 18.2-371.1(B). Accordingly, we reverse the judgment in this case and dismiss the indictment.

Reversed and dismissed.

Huff, J., dissenting.

I respectfully dissent. "When considering on appeal the sufficiency of the evidence presented below, we 'presume the judgment of the trial court to be correct' and reverse only if the trial court's decision is 'plainly wrong or without evidence to support it.'" Wood v. Commonwealth, 57 Va. App. 286, 296, 701 S.E.2d 810, 815 (2010) (quoting Davis v. Commonwealth, 39 Va. App. 96, 99, 570 S.E.2d 875, 876-77 (2002)). "Thus, we do not 'substitute our judgment for that of the trier of fact' even if our opinion were to differ." Id. at 297, 701 S.E.2d at 815 (quoting Wactor v. Commonwealth, 38 Va. App. 375, 380, 564 S.E.2d 160, 162 (2002)). Applying that standard, I believe a rational trier of fact could have found beyond a reasonable doubt that the evidence was sufficient to support a conviction of felony child neglect.

"To be willful, conduct 'must be knowing or intentional, rather than accidental, and be done without justifiable excuse, without ground for believing the conduct is lawful, or with a bad purpose.'" Jones v. Commonwealth, 272 Va. 692, 699, 636 S.E.2d 403, 406 (2006) (quoting Commonwealth v. Duncan, 267 Va. 377, 384, 593 S.E.2d 210, 214 (2004)). "In other words, 'the defendant must have been aware that [the] conduct was likely to result in serious injury.'" Flowers v. Commonwealth, 49 Va. App. 241, 248, 639 S.E.2d 313, 316 (2007) (alteration in original) (quoting Mangano v. Commonwealth, 44 Va. App. 210, 215, 604 S.E.2d 118, 121 (2004)).

"'Conduct that is gross, wanton and culpable demonstrating a reckless disregard for human life is synonymous with criminal negligence.'" Ferguson v. Commonwealth, 51 Va. App. 427, 438, 658 S.E.2d 692, 697 (2008) (*en banc*) (quoting Jones, 272 Va. at 701, 636 S.E.2d at 408). "Criminal negligence is 'judged under an objective standard and, therefore, may be found to exist where the offender either knew or should have known the probable results of his acts.'"

Jones, 272 Va. at 701, 636 S.E.2d at 408 (quoting Kelly v. Commonwealth, 42 Va. App. 347, 356, 592 S.E.2d 353, 357 (2004)).

In this case, appellant discovered that T.D. was in serious distress but chose not to immediately contact emergency services. Appellant instead spoke on the telephone to Tyler and his mother numerous times, and briefly called 411 after his initial text message to Tyler. Moreover, there was a period of twenty-seven minutes during which appellant did not place or receive any telephone calls. Rather than taking active measures to ensure T.D. received treatment, appellant waited at the residence for his mother, who advised appellant to contact 911. It was not until one hour and twenty-one minutes after identifying T.D.'s symptoms as "serious" that appellant placed the call for medical emergency personnel.

Furthermore, appellant was aware that T.D.'s symptoms warranted immediate medical attention. In speaking to police officers, appellant stated that T.D. had defecated and vomited a brown, blood-like substance. After appellant attempted to rinse T.D. off in the bathroom, T.D. suddenly "went limp" and stopped breathing. Rather than immediately obtaining expert medical assistance, however, appellant performed CPR on T.D. for fifteen to twenty minutes without success. Following the incident, appellant further acknowledged that he should have called for an ambulance based on the nature and severity of T.D.'s symptoms. In particular, as the trial court noted, appellant had "seen [T.D.] spit up before, but this was different." For these reasons, a rational trier of fact could determine beyond a reasonable doubt that appellant acted willfully in a manner that was so gross, wanton, and culpable as to show a reckless disregard for T.D.'s life.

Contrary to the majority's indication, I do not believe the trial court relied solely on appellant's failure to immediately contact 911 as the basis for its decision. Rather, as the trial court explained, it considered appellant's delay in calling for emergency services in conjunction with the facts and circumstances discussed above. Moreover, as the majority correctly points

out, the trial court did not doubt appellant's credibility based on his statements to police. To the contrary, the trial court simply determined that appellant *should have known* his conduct would subject T.D. to serious harm. Therefore, I would hold that the evidence is sufficient to sustain appellant's conviction of felony child neglect, and I would affirm the judgment of the trial court.